LeFevre, Plaintiff in error, vs. The State, Defendant in error.*

*January 15—March 9, 1943.*

* Motion for rehearing denied, without costs, on May 18, 1943.

*J. E. O'Brien* of Fond du Lac, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, William A. Platz,* assistant attorney general, *S. Richard Heath,* district attorney of Fond du Lac county, and *L. J. Fellenz, Sr.,* special assistant district attorney, and oral argument by *Mr. Heath, Mr. Fellenz,* and *Mr. Platz.*

MARTIN, J. For a period of about five years continuously prior to January 31, 1941, Joe Rookes was the proprietor of a small restaurant located on the east side of South Main street in the city of Fond du Lac. He had several employees who worked in the restaurant. At 7:50 o'clock on the night of January 31, 1941, Rookes left his place of business and did not thereafter return. His body was found in Lake Winnebago near Black Wolf Point on November 1, 1941. On February 1, 1941, Anton Raasch went to what is known as "Hobbs Woods" to get wood. There he noticed in the snow a set of tire tracks which led from the traveled portion of the road toward a fence which inclosed the woods. About two feet north of the north tire track he found a large pool of blood and in this blood a bow, lens, and part of the nose bridge of a pair of eyeglasses. These were identified as having been made for Joe Rookes. Raasch found no footprints or other marks of any kind in the snow except the tire tracks.

On February 2, 1941, Bernard Barr found at the place where Raasch had shoveled the bloodstained snow additional parts of eyeglasses which were also identified as belonging to Rookes. On February 2d a group of boys, who had learned of Rookes' disappearance on the night of January 31st and of the finding of parts of his eyeglasses on February 1st, went

to Hobbs Woods to search for Rookes' body. In their search they found under a bridge in the vicinity of Hobbs Woods several spots of blood. Peter Frank, one of the boys, gathered up some of the bloodstained snow which was then frozen. He also took some of the bloodstained snow from the spot of the pool of blood found by Raasch. Both samples were later turned over to the police who sent them to the FBI at Washington, D. C., for analysis. The FBI bureau reported that the samples contained human blood. There were footprints in the snow leading down to where the blood spots were found under the bridge.

Dr. E. L. Tharinger, a pathological specialist, who made a complete post-mortem, testified that death was caused by fracture of the skull, caused by a severe local, external violence to that particular portion of the skull; that the area fractured was from the ear almost to the middle line of the back of the skull; also a skull fracture on the left side; that the bones of the forearms and hands were absent; that the right foot, including the bones of the ankle, and bones of the right leg were absent; that both bones of the left leg were fractured above the ankle; that nine or ten ribs on each side were fractured. Dr. Tharinger said he did not think that the fractures of the leg bones were caused by pounding on the rocks of the shore of Lake Winnebago, but that the ribs might have been fractured in that manner. He was not asked by either state or defense counsel whether the fractures of the skull could have been caused in that manner.

Dr. Florin testified that a blow of sufficient force to cause a fracture of the skull would cause both internal and external bleeding. There is no evidence of any bloodstains having been found on any part of the defendant's car, although the police officers, sometime between March 6 and March 20, 1941, had the car in their possession a couple of days, for the purpose of examining it to ascertain if there were any blood spots or stains on the car.

Mrs. Hazel Burke, an employee in Rookes' restaurant, testified that in the late afternoon of January 31st she asked Rookes whether he was going to listen to the Joe Louis-Red Burma fight that evening. She said Rookes replied that he did not know if the fellow had a radio in his car; that she asked him who he meant and Rookes replied, "Frank who used to work for Candlish" (defendant had worked for Candlish sometime prior to 1933) ; that Rookes said Frank had told him he had two sons old enough to join the army and he wanted them to go into the restaurant business at Beaver Dam so they would not enlist in the army (defendant had three sons who, at the time of the trial in May, 1942, were sixteen, eighteen, and twenty years of age, respectively; not subject to draft at the time in question), that Frank was going to look at some used restaurant equipment that evening and that he was going along because he knew the value of such equipment and would see that Frank did not get gypped.

Mrs. Anna Mae Chase, an employee in the restaurant, testified that just before Rookes left the restaurant at about ten minutes to 8 she heard him say, "There comes Frank now;" that he took his coat and hat and went out; that she watched Rookes go past the restaurant, saw him stop in the alleyway between the restaurant and the Legion Tavern next door; that Rookes then continued walking in a northerly direction on Main street; that she did not see him meet or talk to anyone after he left the restaurant. She further testified that at about 7 :30 p. m. Rookes checked the cash in the register; that he left about $10 in the register to make change; that he then went into the back room where the safe was located; that she did not know whether he put any money in the safe or not; that when Rookes left the restaurant evenings he would usually return at about 9 or 9 :30 o'clock; that on the night of January 31st he did not return; that she remained in the restaurant until about 3 o'clock the following morning, at which time her husband called for her; that she then called Harry Burke,

who was also an employee in the restaurant, and told him that Rookes had not returned. Burke came to the restaurant to lock up. He found the safe open. He locked the safe, closed the restaurant, and returned home. Burke opened the restaurant at about 6 a. m. on February 1st. He then unlocked the safe, found $69 in one-dollar bills. About a week later the private box in the safe was opened and it contained $500 in currency, also Rookes' bankbook.

Mr. Burke testified that on the evening of January 31st, between 5 and 5:30, Rookes cashed two checks for Alvin Danner, a section foreman on the Soo line; that they were both Soo Railway Company checks, payable to the order of Mr. Danner, one for the sum of $49.16, and the other for $5.76; that when Rookes cashed the checks he put them with a roll of money in his pocket; that he had a large roll of money on his person; that Rookes, during the afternoon, had cashed two other checks, one for Earl McCumber, the other for a man named Sharples. The two checks which Rookes cashed for Danner were both dated December 31, 1940. They were both indorsed, "Alvin Danner" and "F. B. LeFevre." "F. B." are defendant's initials. The checks were not indorsed by Joe Rookes. They were both cashed by LeFevre on February 1st at the First Fond du Lac National Bank.

In explanation of his possession of and cashing said checks, defendant testified that in the forenoon of February 1st as he was walking toward the Ahern clothing store to buy a pair of work gloves, which store is right next to the First Fond du Lac National Bank, a party known to him by the name of "Al," who was in an automobile and appeared to be crippled, called to defendant and asked him if he would take the checks into the bank and bring him the cash; that he took the checks, went into the bank, indorsed them, returned to the automobile, and gave "Al" the proceeds of the two checks; that the bank clerk who waited on him had known him for a number of years.

Alvin Danner, to whom the checks were made payable, testified that he cashed them at Rookes' restaurant at about 5:30 the evening of January 31st; that Rookes took a large roll of money out of his pocket, gave him the cash, then wrapped the checks around the roll of money, put a rubber band around it, and put it back in his pocket.

John F. Tyrrell, expert examiner of questioned documents, testified that the two checks (Exhibits 12 and 13) were made by the same person and with the same ink; that he believed that the indorsements were made with different pens. He said that the indorsement on Exhibit 12 was better formed than the indorsement on Exhibit 13; that the indorsement on Exhibit 13 was a coarser line than on Exhibit 12. Mr. Tyrrell's analysis was based on pens sent to him on or about November 17, 1941. These pens were taken from the counter at the bank after several days use. One was slightly more used than the other. They were both Estabrook pens but of different numbers. The two pens offered and received in evidence on the trial as Exhibits 30 and 31 were samples of the two kinds of Estabrook pens. They were not, however, the same pens that Tyrrell was given to analyze in November. Asked whether there was an appreciable difference in the writing quality of the same numbered pens made by the same manufacturer, he said that originally there would not be much difference because the pen manufacturer puts out pen points that are as nearly identical as possible, but "after this article or pen has been in use for some time it undergoes some changes. Sometimes it becomes more flexible, especially where there are finer and thinner materials. So that after a pen has been in the same use there has been some change." He also said that there might be an inference that the first pen used did not write well and a different pen was used in making the second indorsement. From the evidence it appears that with ordinary use these pens were changed about every ten days. If the life of

the pen depends upon its use, it is not improbable that after a few days use two pens of the same make and number will show different lines in the writing quality. One may show a coarser line than the other.

As to the ink used in the indorsement of the checks, Exhibits 12 and 13, Mr. Tyrrell testified that he did not think that the ink was the same as that used in the bank. It appears that in the bank Sanford's Royal Blue ink was used. However, in this connection, it appears that the sample of ink sent to Mr. Tyrrell at the same time the pens referred to were sent him was taken from a bottle of fresh ink. He was not furnished, nor did he analyze, any ink that had been standing in the inkwells of the bank. It further appears that the ink used in the inkwells on the bank counters had to be changed every week or ten days. Mr. Tyrrell's testimony relates to the same brand of ink, but the sample which he analyzed, and on which he based his belief, came from a fresh bottle. His analysis and testimony relate entirely to fresh ink. What his analysis might have shown had the ink been taken from inkwells on the bank counters, which had been used and exposed for several days, we do not know.

The state, in its brief, claims that the "Al" referred to in defendant's testimony is a straw man, a mythical "Al." However, the state, in rebuttal, did not regard this man "Al" either as a straw man or a myth. The state offered evidence that "Al" was not in a crippled condition on January 31st; that he fractured a leg on February 10th. It is quite clear that the state offered this testimony to disprove defendant's testimony to the effect that "Al" appeared to be in a crippled condition on February 1st, when he asked defendant to take the two checks into the bank and get them cashed. In rebuttal the state also offered evidence to show that this "Al" was involved in an automobile accident on January 1, 1941; that his car was smashed up and that he did not have it repaired until after his recovery. We think it rather strange that neither

the state nor defense produced this man "Al" as a witness at the trial. We can appreciate why he might not want to involve himself with the possession of the checks. On the other hand, if he did not have the checks and did not give them to defendant to be cashed there would be no incriminating circumstances as far as he was concerned.

Early on the morning of February 1st a member of the police department called defendant at his residence to inquire if he had been out with Rookes the night before. Defendant replied that he had not. Shortly thereafter defendant, on his way downtown, stopped at the police station and was there told by one of the officers that Rookes had left his restaurant at about ten minutes to 8 the evening before and had not returned. While at the police station defendant's car was parked in the immediate vicinity. This was before defendant cashed the two checks at the bank. On February 4th defendant was called to the police station and questioned at length as to his whereabouts the evening of January 31st, and concerning any contact or conversation he had with Rookes on the afternoon of January 31st. It appears that before the police officers questioned defendant they had been told by Mrs. Burke of the conversation she had with Rookes about going out with "Frank who used to work for Candlish," who wanted to buy some secondhand restaurant equipment.

Defendant said that at about 4 o'clock on the afternoon of January 31st, while passing Rookes' restaurant, Rookes stood in the doorway with a clock under his arm and asked defendant to step into the restaurant and see his new clock, which defendant did; that he made some remark about the clock not hanging straight; that he was not in the restaurant more than a couple of minutes, and as he left Rookes also left, stating that he was taking the old clock across the street to a grocer. Defendant accounted for his whereabouts during the entire evening of January 31st from approximately 5 o'clock until he retired for the night.

On March 6th police officers called for defendant at his home and took him to the police station. They showed defendant the two checks which they had received from the Soo Railroad Company (state Exhibits 12 and 13), which bore defendant's indorsement, which he had cashed at the bank on February 1st. Defendant said that he had indorsed and cashed the two checks, but stated that he knew nothing about the checks having any connection with Rookes; that Rookes' name was not on the checks; that he had received them from a man known to him only as "Al;" and related the same facts to which reference has hereinbefore been made. Defendant was kept in the police station and in jail all night on March 6th. The morning of March 7th defendant was asked by one of the police officers if he would go to Madison and take the lie-detector test. He immediately consented and was then taken to the office of the district attorney, where he signed an agreement to submit to a lie-detector examination to be conducted by Prof. Mathews of the chemistry department of the University of Wisconsin. This agreement in part provided:

"It is further stipulated and agreed by and between the said Frank LeFevre and S. Richard Heath that any fact, matter or thing disclosed by said lie-detector examination of said Frank LeFevre and the findings of Prof. Mathews thereon, may be admitted in any trial or preliminary examination before any of the courts of the county of Fond du Lac and state of Wisconsin."

The examination was conducted by Prof. Mathews on March 7th. Mathews reported his findings to the district attorney and for some reason, not explained by the district attorney or any of the officers, they were not satisfied with the report and findings made by Mathews. On March 18th defendant was asked if he would submit to another lie-detector test to be conducted by Prof. Leonarde Keeler of Chicago. Defendant consented and the district attorney prepared a stipu-

lation identical in terms to the stipulation for the examination by Mathews. On March 20th defendant was taken to Chicago where he submitted to three lengthy polygraph tests. The examinations at Chicago were conducted by George W. Haney, an associate of Prof. Keeler. The report of the examinations and all the records in connection with the tests were reviewed by Prof. Keeler. The district attorney was not satisfied with the report and findings made by Haney and Keeler.

On the trial defendant offered the report and findings of Prof. Mathews; also the report and findings of Haney and Keeler. On objection by the state, those parts of the reports containing the findings were excluded and did not get before the jury. They were properly excluded. *State v. Bohner,* 210 Wis. 651, 246 N. W. 314. The district attorney, in rebuttal, testified as follows as to his conversations with the defendant relative to the lie-detector tests. His testimony came in without objection. He said:

"I drew up a written stipulation before he went to Madison to the effect that either the state or the defendant could use the finding of the lie-detector test at the trial, if there was one. Before he went to Chicago on March 20th to take another lie-detector test, I drew up a like stipulation. I told him in my office about going to Chicago, that it was important to him as well as to the state that 'if we were satisfied with that test, it might be we would have to look elsewhere.' I said it might clear the thing up. Reports from Madison favorable to the defendant were not satisfactory to me. Before going to Chicago he was brought to my office by the officers. He said to me it was rather sudden, and he thought he was all through after he passed at Madison. I said it wasn't entirely satisfactory to me.

"Q. Didn't you say to him: 'Frank, if you go down to Chicago and you pass that test again, why we will give you up; we will give up your angle and go after somebody else.' A. Well, I can't say I said those exact words. I told him it might result in our having to look elsewhere.

"I conveyed the thought to him if he passed the test in Chicago, we would go at it at some other angle; that we would look elsewhere—something to that effect. I meant we would have to look somewhere else for the guilty party if he passed the test in Chicago. The test in Chicago was not satisfactory to us. It was favorable to the defendant. When he came back from Chicago, he went back to his railroad work, and from March 20th until December 12th when he was arrested, he was not further disturbed by myself or the officers."

The state contends that the motive was to murder and rob, and in that connection the state introduced evidence of defendant's financial condition. The state's evidence tends to show that from July 25, 1940, to March 25, 1941, defendant's gross earnings were $1,110.62; that defendant spent, during the same period, $1,256; that during the period defendant borrowed $325 from his father, and $158 from a finance company on December 7, 1940. However, during this period the two older sons had substantial earnings, most of which was contributed to the family use. The earnings of the father and two sons during the period mentioned exceeded the total disbursements by a substantial amount. We see no occasion for further reference to defendant's financial condition; nor do we find in his financial condition any evidence to support the state's theory of a motive for the crime, in so far as trying to connect defendant with the murder.

The defendant is a married man, fifty-two years of age. The family consisted of himself, his wife, and three sons. He graduated from high school and attended Ripon college for three years. He enlisted in the first World War and served twenty-eight months, eighteen of which were with the AEF in France. He has no criminal record aside from the present charge against him. Several witnesses on the trial testified that his reputation as a law-abiding citizen was good. With the exception of the period of his service in the army, he has resided in Fond du Lac county. From the moment he learned that he was under suspicion for the murder of Rookes until

the time of his arrest on December 12, 1941, he rendered to the public officials of Fond du Lac county the fullest co-operation. This is evidenced by the testimony of the district attorney; it is shown by his willingness to submit to the lie-detector tests by two of the nationally known experts in that field. We have the word of the district attorney that those tests were favorable to the defendant. While the findings of these experts were properly excluded from the jury, the district attorney's testimony came in without objection and we regard it as very significant.

The circumstance of defendant cashing the two Danner checks on February 1st, which were cashed by Rookes for Danner on the afternoon of January 31st, is the foundation on which the state's case rests. Even though the jury might disbelieve the defendant's explanation as to how the checks came into his possession, and his cashing same, that circumstance does not establish beyond a reasonable doubt that he murdered Rookes. There is no evidence that Rookes had the checks on his person when he left his place of business at about ten minutes to 8 the evening of January 31st. There is no evidence that the defendant and Rookes were seen together at any time or place after he left his place of business.

On the proof as to venue, the trial court held that Rookes was murdered at Hobbs Woods, where the pool of blood and the parts of his eyeglasses were found. The witness Raasch, who on the morning of February 1st found this pool of blood and parts of the eyeglasses, said that the only tracks in the snow where the blood was found were two tire tracks; that the pool of blood was at a point about two feet north of the north tire track. The state's theory as stated by the district attorney is that Rookes was killed by a blow on the head administered at Hobbs Woods where the pool of blood was found in the snow. The state's evidence shows that there were no marks in the snow, other than the tire tracks and the pool of blood, which is described as being six or seven inches in diameter and

soaked solid down into the ground. There was not a single footprint in the snow or evidence of any struggle having taken place there. The state contends that on the fatal night defendant took Rookes into his car, drove him south of Fond du Lac about twelve miles to Hobbs Woods, there killed him, then took the body to a point north of the city, weighted it down, and placed it in Lake Winnebago. The state's theory and evidence would impel the conclusion that the murder was committed in the car. The medical testimony is to the effect that a blow of sufficient force to cause a fracture of the skull would cause internal and external bleeding. No stain of blood was found on any part of the defendant's car, and it was examined for that purpose. There is no evidence of any blood-stains on defendant's clothes.

We must, and do, assume that the jury disbelieved the defendant's testimony as to the manner in which he obtained possession of the two Danner checks on February 1st. To sustain the conviction the proof must be such as to warrant the jury's finding beyond a reasonable doubt that defendant murdered Rookes and took the two checks from his person. As stated above, there is no evidence that Rookes had these checks on his person when he left his place of business at about 8 o'clock the evening of January 31st. There is no proof of defendant being with Rookes at any time after he left the restaurant. The cashing of the checks, in and of itself, does not prove that defendant was present when the murder was committed. The defendant's statement that the checks were handed to him by a man known to him only as "Al" leaves the impression that more might have been presented to the court in corroboration or in refutation. This man "Al" was not called as a witness. The burden of proof was upon the state.

Circumstantial evidence will sustain a conviction only where all the incidents are satisfactorily established and are consistent with the happening of some particular event, *and inconsistent with any other reasonable theory than that they tell the correct story of how such event happened to take place. Loguidice v.*

*State,* 160 Wis. 17, 20, 150 N. W. 980; *Wittig v. State,* 235 Wis. 274, 281, 292 N. W. 879.

At the conclusion of the state's case, and again when all the evidence was in, defendant's counsel moved that defendant be discharged on the ground that the evidence failed to establish his guilt beyond a reasonable doubt. Both motions were denied. Upon the whole record we cannot say that the proof is sufficient to enable the jury to find that defendant was guilty beyond a reasonable doubt.

*By the Court.*—Judgment reversed. The warden of the state prison at Waupun, Wisconsin, is directed to forthwith discharge the defendant, Frank B. LeFevre, from custody.

BARLOW, FOWLER, and FRITZ, JJ., dissent.