STATE, Respondent, vs. MILLER, Appellant.

*May 18—June 15, 1945.*

*Edward S. Eick* of Chilton, attorney, and *J. E. O'Brien* of Fond du Lac of counsel, for the appellant.

For the respondent there was a brief by the *Attorney General, William A. Platz,* assistant attorney general, *Franklin J. Schmieder,* district attorney of Calumet county, and *Hel-*

*muth F. Arps,* special assistant district attorney, and oral argument by *Mr. Platz* and *Mr. Arps.*

MARTIN, J.  In connection with the statement of facts reference is made to the map on the following page for a clearer understanding of directions, distances, and location of certain points.

The deceased Arthur Martin, a married man, fifty-six years of age, five feet seven inches tall, weighing one hundred forty-seven pounds, resided with his wife and family at Gravesville, an unincorporated village just east of and adjoining the city of Chilton in Calumet county, Wisconsin.  On the evening of November 6, 1943, Mr. Martin left his home on foot at about 6:30 o'clock to go to Chilton.  He was dressed in black trousers, black overcoat, black oxford shoes, tan hat, and was wearing glasses.  His customary route was to travel west on a street in Gravesville until its intersection with County Trunk Highway F at the Weber tavern; thence to travel southwesterly and westerly on County Trunk Highway F, crossing the bridge, indicated on the map, near the Carnation company driveway; thence along a cinder path on the north side of the county trunk highway until he reached the east city limits of Chilton; thence along a concrete sidewalk on the north side of east Main street into the city.  The distance from the west edge of the bridge to the city limits is approximately one hundred eighty feet.

At about 6:45 p. m. the body of Mr. Martin was found by Mr. and Mrs. Fred Schmidt, their daughter, and a Mrs. Schaefer, who were walking east on the north side of the county trunk highway on the cinder path leading to the bridge. The body lay one hundred eighty-five feet west of the bridge; it was lying face upward, fully extended, one arm folded across his chest; a scalp wound extended from the upper part of his forehead in a U-shape backwards to a point above his ears.  There was a discoloration or black spot about one inch

long and one and one-half inches wide on the skull where the scalp had been ripped loose. His oxford shoes were found still laced; one about twenty feet west of the body, near the curb; the other about twenty feet southwest of the body, near the center line of the concrete highway. His hat and glasses were found on the cinder path about sixty feet east of the body. There were no other bruises or marks on the body, or any blood on his face or clothing. A small pool of blood was found under the head, apparently from bleeding of the scalp wound.

The medical testimony was that death was caused by the injury to the head. The state contends that deceased's body was either placed where it was found or thrown there. Though it had rained during the afternoon and evening, deceased's stockings were not soiled or muddy, there was no mud on any of his clothing, nor was his clothing torn or in disarray.

Dr. N. J. Knauf, who examined the body at about 7 p. m. at the location where found, testified that the immediate cause of death was a blow on the head; that he did not think the blow was caused by a blunt instrument. The doctor was asked:

"*Q*. . . . Did it appear that the body was thrown there or was he placed there? *A*. I wouldn't be able to answer that; I don't know. The nature of the weather at that time of the night being rainy all afternoon, all evening, if he walked there his stockings would have been muddy and there was no evidence of that. The position of the body indicated that he was there and without any effort on his part."

He further testified that the distance from the curb to the cinder path was about three feet; that the cinder path was between three and one-half to four feet wide and that the body lay in the center of the path; that after viewing the body he examined the locality near the scene of the accident; that he saw both shoes; that the lacings were not untied; that the shoes were wet but not muddy.

344

The defendant, forty-two years of age, lives in the village of Gravesville, is married and has a family, has lived there practically all his life. For the last twenty years he has worked for the Lawson company and is a machinist by trade. He has never been in any trouble or accused or convicted of any crime. November 6, 1943, was a Saturday. During the afternoon he drove to Chilton, stopped at various places on business. During the afternoon he drank three bottles of beer. He then drove back to Gravesville and stopped at Weber's tavern, getting there about 6:15 in the evening. He was there until about 6:35, at which time he left for Chilton to meet the Manitowoc-Fond du Lac bus which was due at 6:40, intending to meet his sister-in-law who was coming to his home for a party to be held that night. In going from Weber's tavern to the bus station he drove west on Trunk Highway F, crossed the bridge, continued on west to the east city limits of Chilton and continued west on East Main street. While driving on East Main street and at a point directly in front of Bosma's tavern his automobile collided with Bosma's car which was there parked at an angle. The right front fender and right front wheel of defendant's car came in contact with the Bosma car, causing same to come in contact with a car parked beside it. Defendant went into the Bosma tavern and settled with Bosma for the damage done to his car, for $5. The right front fender of defendant's car was bent up against the hood, the right headlight was tilted up, and as a result of the collision the right front tire blew out.

Mr. Fred Schmidt, a witness for the state, testified that he had gone to the bus station in Chilton to meet his wife who was coming in on the bus from Manitowoc; that as he, his wife, and daughter, and Mrs. Schaefer were walking east on Main street on the way to their home in Gravesville, and when he was at a point about opposite the canning company office, shown on the map, which would be approximately four hundred feet west of the bridge, he saw a car coming from the east; that he saw the car from the time it crossed the bridge

until it passed him and his party and until the car turned in in front of Bosma's tavern; that as this car passed him he recognized defendant as the driver of the car. He further testified that as the car passed it was quite noisy; that it had a flat tire.

According to Mr. Schmidt's testimony he not only saw the car continuously from the time it crossed the bridge until it passed him and his party near the canning company office, but he turned as it passed and observed it as it traveled several hundred feet west on Main street until it turned in in front of Bosma's tavern. He was not asked and did not testify as to whether the car stopped at any point between the bridge and Bosma's tavern. He was not asked and did not testify as to whether he saw a man walking along the street or the cinder path between the bridge and the east city limits, or that he saw the car strike a man at or near the bridge or at any point between the bridge and the place where Mr. Martin's body was found.

Mr. Schmidt further testified that no other cars had passed in either direction from the time they proceeded from the Chicago, Milwaukee, St. Paul & Pacific Railway depot until the time the car driven by defendant passed. There is other testimony to the effect that during this period other cars had passed in both directions. Mr. Schmidt further testified that when they were at the railway depot it was raining a little bit; that when they got down looking at the body it started to rain pretty heavy; that the sidewalk west of the bridge was muddy; that nobody could walk there.

Mrs. Fred Schmidt, witness for the state, testified that she came in on the bus from Manitowoc; that her husband met her at the bus station; that she, her husband, and her daughter then proceeded to walk to their home in Gravesville; that a Mrs. Schaefer, who also lived in Gravesville, walked along with them; that they did not meet any car until they had got almost to the place where Mr. Martin's body was found; that she did not see the light on any car east of the bridge; that a car passed them, driven by the defendant, going west toward

Chilton; that no other car passed them at that time going either east or west; that the car driven by defendant was the only car that passed them; that it was traveling on a flat tire; that as the car passed them she watched it until it had gone beyond the depot.

Mrs. Schmidt did not testify to seeing any man walking either in the street or on the cinder path. She was not asked and did not testify as to whether or not the car driven by defendant had stopped at any point from the time she first saw it at the bridge until it had passed the depot, or that defendant's car struck any man or other object during the time she observed it.

Neither Mrs. Schaefer nor the Schmidt girl were called to testify.

Mrs. Rose Marie Wagner, witness for the defense, testified that on the evening of November 6, 1943, she and her mother drove to Chilton; that they left home at about 6:45; that it was raining; that they drove west from Gravesville to Chilton; that as they proceeded into Chilton they passed a man on the bridge; that the man was out toward the center of the bridge; that she had to turn her car to the left and across the center line to pass around him; that as they came into the city they met two cars traveling in an easterly direction; that they met the first car near the curve at the east city limits, and the second car about in front of the City Service; that the first car was traveling very fast.

Mrs. Josephine Eberly, a defense witness who was in the car with her daughter Mrs. Wagner, testified that they left home at about 6:45 p. m.; that from Gravesville they drove west on County Trunk Highway F, then proceeded into Chilton; that they passed a man right on the bridge; that he was walking four or five feet from the rail of the bridge; that he was wearing a dark, long overcoat; that as they approached the bridge her daughter remarked, "There's a man walking and he is over on the road." She was asked:

"*Q.* Did you notice him any more after you passed him? *A.* Well I looked out of the side window because he was there on the bridge and I said that I felt sorry for him, maybe we splashed him, and so I looked out of the side and back window and he didn't look very hurt so I said maybe we didn't splash him anyway."

She further testified that it was raining quite hard at the time; that a short ways from where they passed this man they met a car near the east city limits; that they met a second car about halfway between the city limits and the canning company office.

While defendant was in the Bosma tavern a Mr. Ott came in and announced to the tavern patrons that someone had been hit by a car near the Carnation company bridge. There was a discussion of the matter and shortly thereafter the sheriff came into the tavern and talked to the defendant about the collision of his car with the Bosma car. During this conversation the sheriff made no mention of the man being hit down the street. During the general discussion by the patrons of the tavern about a man being hit defendant remarked, "I suppose they will blame me for that too." The state attaches considerable significance to this remark. It appears to be quite a commonplace remark under the circumstances. The sheriff had just finished interrogating defendant about the collision of his car with the Bosma car, the damage for which defendant had already settled.

It appears that on three or four occasions following the finding of Mr. Martin's body both the sheriff and the district attorney questioned defendant at length, apparently trying to elicit information as to whether his car had struck Mr. Martin. There is some testimony to the effect that on one of these occasions defendant replied that he was so drunk that evening he did not know what had happened. This is denied by the defendant. However, assuming such testimony to be

true, it was not an admission by defendant that his car had struck Mr. Martin. It did not relieve the state of its burden of proof that it was defendant's car that struck and killed the deceased. It appears that the court gave undue weight to the alleged admission of defendant that he did not know what had happened because he was so drunk. The admission would have weight and could properly be considered as bearing on the issue of defendant's intoxication.

At the close of the state's case defendant moved that the case be dismissed and defendant discharged because the state had failed to prove beyond a reasonable doubt that it was defendant's car that struck and killed Mr. Martin. In denying the motion, the court, addressing defendant's counsel, said:

"What do you make of his admission that he may have?"

Defendant's counsel replied:

"His admissions may have been to evade questions asked him at the time."

Then the court said:

"Well, it leaves the case open for inference by the jury as to what his motive was. Can't the jury properly infer from the conduct of the person accused of a crime if the crime is admitted? I realize that the case here depends pretty largely upon circumstantial evidence. I think the court much prefers to let it go to the jury and discuss it afterwards."

It appears that the sheriff found two hairs on the running board of defendant's car. He then took some hairs from the deceased's head and sent samples to the Chicago Police Scientific Crime Detection Laboratory. A Mr. O'Neill from that laboratory was called as a witness for the state. The extent of O'Neill's testimony was that the exhibits were similar in color, size, and structure. However, on both his direct and cross-examinations he testified that it would be impossible to positively identify the hair taken from the running

board of defendant's automobile as having come from the head of the deceased.

It seems to us from a very careful consideration of all the evidence that the testimony of Mr. and Mrs. Schmidt that they had their eyes on the defendant's car from the time it crossed the bridge until it had passed them, in fact until it had passed the depot, and that the car had not stopped, and that during this time while they were proceeding eastward to their home in Gravesville they had not seen any man walking either in the street or on the north walk, and their failure to testify that they saw defendant's car or any other car strike Mr. Martin, leaves the case without any evidence to support defendant's conviction. It is a case of circumstantial evidence and while circumstantial evidence will sustain a conviction it will do so only where all the incidents are satisfactorily established and are consistent with the happening of some particular event and inconsistent with any other reasonable theory than that they tell the correct story of how such an event happened to take place. See *LeFevre v. State,* 242 Wis. 416, 428, 8 N. W. (2d) 288; *Wittig v. State,* 235 Wis. 274, 281, 292 N. W. 879. In the latter case the court said:

"While a conviction may rest upon circumstantial evidence, in order to sustain a conviction it must be of such probative force as to enable the jury to say that the defendant is guilty beyond a reasonable doubt."

In view of the conclusion reached, there would be no point in discussing the issue as to defendant being under the influence of alcoholic beverages, or alleged errors as to admission of evidence, or as to the instructions given or refused.

*By the Court.*—Judgment reversed. Cause remanded with directions to vacate and set aside the judgment of conviction and sentence, and discharge defendant.