STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Arvid E. DEAN, Defendant-Appellant.

Supreme Court

*No. 79–1257–CR. Argued May 1, 1981.—Decided July 6, 1981.*

(Also reported in 307 N.W.2d 628.)

For the petitioner the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs (in this court) was *Bronson C. La Follette,* attorney general.

For the defendant-appellant there were briefs (in court of appeals) and oral argument by *Glenn L. Cushing,* assistant state public defender.

SHIRLEY S. ABRAHAMSON, J. This is a review of a decision of the court of appeals, *State v. Dean,* 98 Wis.2d 74, 295 N.W.2d 23 (Ct. App. 1980), which reversed the judgment of conviction of the circuit court for Walworth county, John J. Byrnes, Circuit Judge.

The issue in this case is whether polygraph evidence unfavorable to Dean is admissible over defense coun-

sel's objection that the stipulation required pursuant to *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974), was executed by Dean after he was charged with the offense but before he was represented by counsel. The circuit court admitted the polygraph evidence. The court of appeals held that the polygraph evidence was inadmissible and reversed the conviction. We affirm the decision of the court of appeals.

Our discussion begins with a consideration of the facts of this case and the issue presented. Because we view this case as an occasion to consider whether we should continue to admit polygraph evidence, we then summarize the theory and operative techniques of the polygraph and review the development of the Wisconsin law on the admissibility of polygraph evidence in the courts of this state, examining the pre-*Stanislawski*, *Stanislawski* and post-*Stanislawski* cases. After assessing judicial experiences with the *Stanislawski* rule and with polygraph evidence in this and other jurisdictions, we conclude that the *Stanislawski* rule does not function in a manner which enhances the reliability of polygraph evidence and protects the integrity of the trial to the degree necessary to justify its continuance. For the reasons we set forth, we hold that hereafter polygraph evidence is not to be admitted in any criminal proceeding in this state unless the *Stanislawski* stipulation was executed on or before September 1, 1981.

I.

The pertinent facts in the case at bar are not disputed. On June 27, 1978, a complaint was filed charging Arvid Dean with failure to remain at the scene of an accident resulting in injury, in violation of secs. 346.67(1) and 346.74(5), Stats. 1979–80. On July 5, 1978, Dean exe-

cuted a *Stanislawski* stipulation. The following day, at his initial appearance, Dean indicated that he was willing at that time to proceed without counsel. The circuit court indicated on the record that it understood that Dean had agreed to take a polygraph.

On August 1, 1978, examiner Robert Peters administered a polygraph test to Dean at the New Berlin regional crime laboratory. Before taking the polygraph, Dean signed a polygraph examination statement of consent in which he stated that he understood his *Miranda* rights, that he did not wish to consult with an attorney, that he knew that he could not be required to take the test without his consent and that he consented to the polygraph examination. The examiner interpreted the results of the test as indicating deception on the relevant questions which Dean was asked about the offense.

Counsel was then appointed for Dean at his request. On April 3, 1979, before trial commenced, the district attorney brought a motion to admit the evidence of the test results. Defense counsel objected on the ground that Dean signed the stipulation without benefit of counsel. A hearing was held on the motion. Dean stated that he had been told that he could withdraw his consent to the admission of the results within sixty days of the taking of the test. The district attorney disputed this assertion. At this hearing neither the circuit court, the prosecutor, nor defense counsel conducted any inquiry nor introduced any evidence on the reliability of the polygraph as a method for identifying deception or on the conditions under which the polygraph examination was taken, the actual test procedure, the qualifications and competence of the examiner or the method of interpretation of test results. The circuit court granted the state's motion to admit the polygraph evidence stating that Dean had waived his right to counsel, had signed the agreement and that he should not be permitted to renege on the agreement because he was unhappy with the re-

sults. The polygraph evidence was admitted as part of the state's case in chief. Dean was convicted on a trial to the jury.

Dean appealed contending that entering into a *Stanislawski* stipulation is a tactical decision for defense counsel and that a defendant cannot voluntarily and intelligently execute the stipulation without advice of or waiver of counsel or appropriate admonitions by the trial court. Dean distinguishes a polygraph examination stipulated to by the defendant from oral custodial interrogation to which the defendant, without benefit of counsel, submits after receiving the *Miranda* warnings. *Miranda v. Arizona,* 384 U.S. 436 (1966).

The court of appeals based its decision on an interpretation of *State v. Craft,* 93 Wis.2d 55, 286 N.W.2d 619 (Ct. App. 1979), aff'd on other grounds 99 Wis.2d 128, 298 N.W.2d 530 (1980). The court of appeals held that a defendant may execute a valid polygraph stipulation if the defendant has waived the right to counsel for purposes of the execution of the polygraph stipulation. The validity of a defendant's waiver of right to counsel for this purpose, the court of appeals held, is governed by the same rules which determine the validity of a defendant's waiver of right to counsel for the trial. *Faretta v. California,* 422 U.S. 806 (1975) ; *Pickens v. State,* 96 Wis.2d 549, 292 N.W.2d 601 (1980). Thus the court of appeals held that before an unrepresented defendant can enter into a valid *Stanislawski* stipulation, a *Faretta* hearing must be held to determine if the waiver of counsel is made knowingly and voluntarily.[1] The defendant must also be informed that the reliability of polygraph evidence is suspect, and that the polygraph evidence is inadmissible absent a stipulation. *Dean, supra* 98 Wis.2d at 79–80. No such hearing was held by the circuit court

---

[1] *Cf. Commonwealth v. Moynihan,* 376 Mass. 468, 381 N.E.2d 575, 581 (1978).

in the *Dean* case. The court of appeals concluded that the polygraph evidence should not have been admitted and reversed the conviction.

In reaching this result the court of appeals considered and rejected other alternatives proposed by the parties. The state suggested determining the validity of the stipulation by applying the rules governing the admissibility of statements resulting from custodial interrogation. The complexity of the evidentiary questions relating to the polygraph, however, distinguishes a defendant's decision to execute a stipulation from the defendant's decision to speak with police after receiving the *Miranda* warnings. Dean proposed a *per se* rule prohibiting unrepresented defendants from entering into a valid *Stanislawski* stipulation. The complexity of the polygraph procedure and the difficulty in attacking the testimony militate to some extent in favor of the *per se* rule. Adoption of a *per se* rule would raise the question of whether a defendant's sixth amendment right to proceed without counsel had been impaired. *Faretta v. California*, 422 U.S. 806 (1975). This court's choice of alternative solutions to the issue Dean presents is largely dependent upon the court's view of the nature of the polygraph evidence and of the effectiveness of the conditions set forth in *Stanislawski*. Consequently we take this occasion to reexamine the nature of the polygraph evidence and the *Stanislawski* decision allowing the admission of polygraph evidence upon stipulation of the parties and upon the other conditions set forth in the decision. This examination is timely in our view since we have now accumulated over seven years' experience with the *Stanislawski* rule. In sum, we deem it appropriate, in considering the issue posed in this case, to consider first whether we should continue to admit polygraph evidence on the basis of *Stanislawski*.

Our reexamination of *Stanislawski* at this time is aided by the fact that in several of the cases which have come before this court raising questions about admissibility of polygraph evidence, counsel have addressed the question of whether *Stanislawski* should be overruled. At oral argument in this case, and in oral argument in previous cases, the attorney general's office has taken the position that *Stanislawski* should be overruled. At oral argument in the case at bar defense counsel, a staff member of the Office of State Public Defender, stated that the Office was taking no position on *Stanislawski* as such. Defense counsel noted, however, that in this particular case, his client's conviction should be reversed whether or not the court overruled the *Stanislawski case*.

Our principal concern in undertaking this inquiry is to determine whether the *Stanislawski* rule has provided a means by which the trial courts can fairly regulate the admission of polygraph evidence while maintaining a workable standard for the reliability of this evidence. If the *Stanislawski* rule has not been successful in this regard we see no reason to prolong its existence much less to add an additional procedure as may be required by the facts in this case.

Our inquiry in this case requires some discussion of the standards for admitting scientific evidence and of the scientific reliability of the polygraph. We do not however treat this case as the occasion to examine the *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923), standard for admissibility of scientific evidence or the question of the scientific reliability or acceptability of the theory of the polygraph. The parties in this case have not submitted evidence or briefs on either of these issues, and we do not decide these issues. *Commonwealth v. Vitello*, 376 Mass. 426, 381 N.E.2d 582, 586 (1978); *United States v. Oliver*, 525 F.2d 731 (8th Cir. 1975), *cert. denied* 424 U.S. 973 (1976). We are, however, aware

that the reliability and the limitations of the polygraph as a technique for determining deception are frequent subjects of discussion in the cases and in the journals.[2] It is apparent from these discussions that the legal and

[2] Polygraphs and polygraph evidence are discussed in numerous books, journals and cases. *See, e.g.,* Reid & Inbau, *Truth and Deception* (2d ed. 1977); Ansley (ed.), *Legal Admissibility of the Polygraph* (1975); Abrams, *Polygraphy Today,* 3 Nat'l J. Crim. Def. 85 (1977); Axelrod, *The Use of Lie Detectors by Criminal Defense Attorneys,* 3 Nat'l J. Crim. Def. 107 (1977); Sevilla, *Reliability of Polygraph Examinations,* 14 Am. Jur. Proof of Facts (2d) 1 (1977); Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials,* 15 Am. Cr. L. Rev. 29 (1977); Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System,* 26 Hastings L.J. 917 (1975); Strong, *Questions Affecting the Admissibility of Scientific Evidence,* 1970 U. Ill. L. F. 1; Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection,* 70 Yale L.J. 694 (1961); Comment, *Compulsory Process and Polygraph Evidence: Does Exclusion Violate a Criminal Defendant's Due Process Rights?,* 12 Conn. L. Rev. 324 (1980); Comment, *The Truth About The Lie Detector in Federal Court,* 51 Temple L. Q. 69 (1978); Note, *Admission of Polygraph Results: A Due Process Perspective,* 55 Ind. L. J. 157 (1979–80); Note, *Polygraphy: Short Circuit to Truth?,* 29 U. Fla. L. Rev. 286 (1977); Note, *The Emergence of the Polygraph at Trial,* 73 Colum. L. Rev. 1120, (1973); Note, *How Some Courts Have Learned to Stop Worrying and Love the Polygraph,* 51 N.C.L. Rev. 900 (1973); Case Note, *Criminal Law—Admissibility of Polygraph Data When Both Parties Have Stipulated That It Will Be Admissible: Cullin v. State, 565 P.2d 445 (Wyo. 1977),* 13 Land & Water L. Rev. 613 (1978); Annot, *Admissibility of Lie Detector Test Taken Upon Stipulation That the Result Will Be Admissible in Evidence,* 53 A.L.R.3d 1005 (1973); Annot, *Modern Status of Rule Relating to Admission of Results of Lie Detector (Polygraph) Test in Federal Criminal Trials,* 43 A.L.R. Fed. 68 (1979); *United States v. Ridling,* 350 F. Supp. 90 (E.D. Mich. 1972); *United States v. DeBetham,* 348 F. Supp. 1377 (S.D. Cal. 1972), *aff'd. per curiam,* 470 F.2d 1367 (9th Cir. 1972), *cert. den.* 412 U.S. 907 (1973); *Commonwealth v. Vitello,* 376 Mass. 426, 381 N.E.2d 582 (1978); *People v. Barbara,* 400 Mich. 352, 255 N.W.2d 171, 182 (1977); *Commonwealth v. A Juvenile,* 365 Mass. 421, 313 N.E.2d 120 (1974).

scientific communities remain significantly divided on the reliability and the usefulness of the polygraph in a criminal case. To provide the foundation for our discussion of the *Stanislawski* rule, we begin by describing the polygraph examination.

## II.

The polygraph machine is a device which measures and records certain involuntary bodily responses, *e.g.*, blood pressure, pulse rate, respiration, and skin resistance to electricity. A quality machine accurately measures and records these body responses. The theory of the polygraph machine is that the recorded and measured objective physiological responses can be analyzed to determine the individual's subjective state of mind. Acceptance of the polygraph test as a method of detecting deception requires acceptance of the premise that there is a relationship between lying and emotions and between emotions and measurable physiological changes. The relation between lying, emotions and physiological changes in the body is not completely understood or scientifically explainable, but empirical evidence appears to support its existence.

Acceptance of both the accuracy of the machine as a measuring device and the operative theory of the polygraph is but the first step in determining whether the polygraph test is a reliable method of detecting deception. It is apparently universally conceded that the machine itself is not independently capable of separating truth from deception. The interaction of the examinee and the examiner and the conditions in which the test is given all play a critical role in the polygraph test.[3]

_____

[3] Reid & Inbau, *Truth and Deception* 2–6, 215–250, 304–307 (2d ed. 1977).

The successful use of the polygraph test to produce reliable results depends on the examinee's biological and psychological makeup. Reid & Inbau, *Truth and Deception* 228 (2d ed. 1977).

The examiner's training, competence, experience, integrity and conduct during the test is as critically important to the reliability of the polygraph as the machine and the examinee.[4] The examiner must obtain back-

---

[4] The crucial role of the examiner is well recognized: "[T]he most important factor involved in the use of any [polygraph] is the ability, experience, education and integrity of the examiner himself." *United States v. DeBetham*, 348 F. Supp. 1377, 1385 (S.D. Cal. 1972), *supra* note 2, quoting Reid & Inbau, *Truth and Deception* 4 (1966). Reid & Inbau, *Truth and Deception* 304–305 (2d ed. 1977) discusses examiner qualifications and training, *inter alia*, as follows:

"Basic to all that has been said with regard to the utility and accuracy of the Polygraph technique is the matter of examiner qualifications.

"An examiner must be an intelligent person, with a reasonably good educational background—preferably a college degree. He should have an intense interest in the work itself, a good practical understanding of human nature, and suitable personality traits which may be evident from his otherwise general ability to 'get along' with people and to be well liked by his friends and associates. No amount of training or experience will overcome the lack of these necessary qualifications.

"Many persons now functioning as Polygraph examiners do not possess these basic qualifications. . . .

". . .

"In our judgment the required period for the training of an examiner is 6 months. Moreover, it must be individualized training from a competent, experienced examiner or examiners with a sufficient volume of actual cases to permit the trainee to make frequent observations of Polygraph examinations and to conduct tests himself under the instructor's personal supervision. . . .

". . .

"Mastering the Polygraph technique is no simple matter. It requires much time and effort. In fact it requires all of one's working time and energy. . . ." (Notes omitted.)

Wisconsin has no law providing for the licensing, regulating and disciplining of polygraph operators.

ground information on the crime and the examinee; must screen out the psychologically or biologically unsuitable examinee; must conduct a pre-test interview; must prepare the test questions; must supervise the environment of the test to eliminate distortive influences; must ask the questions during the examination; must conduct a post-test interview; and must interpret the results of the test. A crucial part of the testing and of the interpretation of the physiological data is the examiner's evaluation of the examinee's visible behavior, such as squirming, coughing, sniffing, and hesitancy. Reid & Inbau, *Truth and Deception*, 17, 19, 23, 292, 295 (2d ed. 1977).

The determination of truth or deception cannot be made directly from the examinee's verbal responses or from the recordings of the machine but rather depends on the examiner's interpretation and analysis of the physiological changes measured and recorded on the charts.[5] The analysis of the chart requires establishing timing between stimulations and responses, accounting for idiosyncracies of the examinee as well as usual or unusual physiological responses due to anger, anxiety or other emotions. The examiner's analysis of the charts is not based merely on the recorded physiological measurements but on the examiner's subjective impressions of the outward behavior of the examinee. Thus while the polygraph is enveloped in an aura of scientific precision and objective measurement of body responses, in large measure the result of the polygraph is dependent on the opinion of the examiner, and that opinion is drawn from a process which is almost completely in the control of the examiner.

---

[5] For a discussion of the nature of the polygraph evidence, that is whether it is testimonial, physical, or expert opinion evidence, *see State v. Chambers*, 240 Pa. 76, 239 S.E.2d 324 (1977).

## III.

We turn now to consider this court's experience with the use of polygraph evidence in criminal cases. We begin by briefly reviewing the history of the admission of polygraph evidence by this court before *Stanislawski*. We proceed to review the *Stanislawski* decision and then the cases involving polygraph evidence after that decision.

## A.

In *State v. Bohner*, 210 Wis. 651, 246 N.W. 314 (1933), this court upheld the trial court's refusal to permit the test of a lie detector to be presented to the jury. Citing the then only reported decision on the admission of the lie detector, *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923), the court concluded that the instrument, a systolic blood pressure device, had not progressed from the experimental to the demonstrated stage. The court said that while the test "may have some utility at present and may ultimately be of great value in the administration of justice, it must not be overlooked that a too hasty acceptance of it during this stage of its development may bring complications and abuses that will overbalance whatever utility it may be assumed to have." *Bohner, supra*, 210 Wis. at 658. Ten years later in *LeFevre v. State*, 242 Wis. 416, 425, 8 N.W.2d 288 (1943), we held that even though the parties had entered into a stipulation for the admission of polygraph evidence, the trial court had properly excluded the findings of two polygraph tests administered to the defendant. In other post-*Bohner* cases this court repeatedly refused to allow the introduction of polygraph evidence whether or not the parties consented to its admissibility. *See State v. Perlin*, 268 Wis. 529, 537, 68 N.W.2d 32 (1955); *State*

v. Baker, 16 Wis.2d 364, 368, 114 N.W.2d 426 (1962) ; Meyer v. State, 25 Wis.2d 418, 425, 130 N.W.2d 848 (1964) ; State v. Nemoir, 62 Wis.2d 206, 214, 214 N.W.2d 297 (1974).

## B.

In *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974), the court reconsidered the rule of blanket exclusion of polygraph evidence. After stating the *Frye* test of admissibility as one of "general acceptance in the particular field in which it belongs,"[6] the court found that there had been a marked change in acceptance of polygraph testing in the forty plus years since *Bohner* and the fifty plus years since *Frye*, and concluded that

[6] The *Frye* test has been the subject of much discussion and debate. The Louisiana Supreme Court in *State v. Catanese*, 368 So.2d 975, 978–979 (La. 1979), explained the flaw in the *Frye* test as follows:

"The 'general acceptance' standard has been the subject of considerable scholarly criticism in recent years. In particular, it has been suggested that the requirement of 'general acceptance' is tantamount to a requirement that the validity of the test be susceptible of such demonstration as to enable the trial court to take judicial notice of the fact. Clearly, the criteria used for determining the admissibility of scientific evidence should not require the instant and unquestionable demonstration required for the judicial notice of scientific facts. Other types of scientific evidence have been admitted into evidence under less stringent standards which merely require the evidence to be 'an aid to the jury' or 'reliable enough to be probative.'" (Notes omitted.)

For a discussion of the *Frye* test, *see, e.g.*, Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half Century Later*, 80 Colum. L. Rev. 1197 (1980); *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978); *State v. Williams*, 388 A.2d 500 (Me. 1978); *People v. Barbara*, 400 Mich. 352, 255 N.W.2d 171 (1977); *United States v. Baller*, 519 F.2d 463, 466 (4th Cir. 1977); *United States v. DeBetham*, 348 F. Supp. 1377, 1382–1384 (S.D. Cal. 1972), *aff'd per curiam*, 470 F.2d 1367, 1385–86 (9th Cir 1972), *cert. den.* 412 U.S. 907 (1973).

"unconditional rejection of expert testimony based on polygraph testing is no longer indicated."[7] The court explained its reasoning as follows:

"... This increased use and acceptance reflects the establishing of polygraph tests, conducted by a competent examiner, as having gained '"standing and scientific recognition among physiological and psychological authorities"' in their particular field. Experts in the field give a high degree of accuracy of dependability to polygraph examinations, conducted by a competent examiner. Polygraph test accuracy is viewed as comparing favorably with other types of expert testimony such as that given by psychiatrists, document examiners and physi-

---

[7] To put *Stanislawski* in proper context, it is useful to describe the facts in the *Stanislawski* case which present a compelling case for the admission of polygraph evidence. Stanislawski had been charged with and found guilty of forcible rape. The complaining witness identified the defendant as the man who had forced her to submit to sexual intercourse and to perform and submit to oral sex over the period of one and one-half to two hours in the early morning of April 25, 1972 on a baseball field in Stevens Point. The defendant denied any connection with the incident, and his sister with whom he lived testified that he was home at the time the complaining witness said she was raped. Certain physical evidence did not support the testimony of the complaining witness.

Both the defendant and the complaining witness submitted to polygraph tests. Both tests given the defendant—each conducted by a different operator—indicated that he had truthfully denied knowledge of or participation in the rape. Both tests given the complaining witness, each conducted by the same operator, indicated that she was not telling the truth in stating she had sexual relations with the defendant and in response to questions as to whether she had told the district attorney the whole truth, whether she was trying to protect someone else in the case and whether she had intercourse with someone other than the defendant in the late night or early morning hours of April 25 or April 26, 1972. The trial court refused to admit any of the polygraph evidence. These circumstances present a strong case for the admission of polygraph evidence. *Cf. United States v. Ridling*, 350 F Supp 90 (ED Mich 1972); *McMorris v. Israel*, 643 F.2d 458 (7th Cir. 1981).

cians. In one court case, experts testified '. . . that the reliability of the opinion of a qualified polygraph expert was higher than the opinions of ballistics experts and as high as the opinions of fingerprint experts.' While experts agree that the training and experience of the examiner are crucial in attaining accurate results, those most familiar with the field believe that polygraph examinations constitute a reasonably reliable diagnosis of truth and deception responses to questions asked. To traditional admission of expert testimony as to fingerprints, ballistics tests, blood tests and handwriting analyses, the past forty or fifty years have seen courts recognize as admissible judicial aids expert testimony as to Nalline tests for narcotics, neutron activation analyses, blood alcohol tests, breathalyzer tests for alcoholic content, voiceprints, electroencephalographs, police artist drawings and infrared spectrometer chromatography. We find it clear that, during the same forty or fifty years, polygraph tests have moved from the 'twilight zone' of *Frye* to such degree of standing and scientific recognition that unconditional rejection of expert testimony based on polygraph testing is no longer indicated." *Stanislawski,* 62 Wis.2d at 738–741 (notes omitted).

While the court noted that significant advances had been made in the field of polygraphy, the court concluded that "withdrawing an unconditional rejection of polygraph evidence does not necessarily mean that polygraph evidence is to have an unconditioned admissibility." 62 Wis.2d at 741. The court withdrew unconditional rejection of polygraph evidence and adopted the conditions for admissibility of polygraph evidence set forth by the Arizona Supreme Court in *State v. Valdez,* 91 Ariz. 274, 371 P.2d 894 (en banc 1962).[8] The court did not ex-

[8] The Massachusetts Supreme Judicial Court took a similar position in *Commonwealth v. A Juvenile,* 365 Mass. 421, 313 N.E.2d 120, 123–124 (1974), explaining as follows:

". . . Although we acknowledge that these scientific and legal developments indicate that the polygraph is making progress in a hoped for evolution toward complete evidentiary recognition, we nevertheless are unwilling to say at this time that the

pressly decide whether polygraph evidence was reliable under the *Frye* standard or under any other standard. The court straddled the question of the reliability of both the stipulated and unstipulated polygraph test. We view the approach taken by the *Stanislawski* court as to the reliability of the polygraph as consistent with that taken by the Arizona Supreme Court in *Valdez,* the case upon which *Stanislawski* relied. The Arizona Supreme Court was not persuaded of the reliability of polygraph technology and based admissibility not on reliability but on the stipulation and the other conditions it set forth in the decision. *See Valdez, supra* 371 P.2d at 900; *State v. Treadaway,* 116 Ariz. 163, 568 P.2d 1061, 1067–1068 (1977); and *State v. Hill,* 40 Ohio App2d 16, 317 N.E.2d 233, 238 (1963).

A student commentator described the *Valdez* decision as follows:

". . . The defendant Valdez claimed that despite a stipulation agreement he signed before his polygraph test, the unfavorable results of that test should have been excluded by the trial court as unreliable and lacking scientific acceptance. The Arizona supreme court agreed

standard in the *Fatalo* case has been met and that the polygraph test results should henceforth be subject to the same rules of evidence applicable to other forms of acceptable expert scientific evidence. We do, however, think that polygraph testing has advanced to the point where it could prove to be of significant value to the criminal trial process if its admissibility initially is limited to carefully defined circumstances designed to protect the proper and effective administration of criminal justice. Accordingly, we hold for reasons stated below that if a defendant agrees in advance to the admission of the results of a polygraph test regardless of their outcome, the trial judge, after a close and searching inquiry into the qualifications of the examiner, the fitness of the defendant for such examination, and the methods utilized in conducting the tests, may, in the proper exercise of his discretion, admit the results, not as binding or conclusive evidence, but to be considered with all other evidence as to innocence or guilt. As a prerequisite the judge would first make sure that the defendant's constitutional rights are fully protected."

that the reliability and scientific acceptance of the evidence did not merit admission, but was nonetheless impressed that the polygraph procedure had been 'considerably improved since *Frye v. United States*.' Believing that '[m]odern court procedure must embrace recognized modern conditions of . . . psychology . . . or other sciences,' the court compromised between complete acceptance and complete rejection and allowed the admission of polygraphic evidence upon the written stipulation of both parties, provided that: (1) the evidence is merely corroborative in nature, or impeaching, but only if the defendant takes the stand; (2) jury instructions stressing this corroborative role are administered; (3) the polygraph expert is available for cross-examination by the opposing party; and (4) the admission is at the discretion of the trial court." Note, *Polygraphy: Short Circuit to Truth*, 29 U. Fla. L. Rev. 286, 309 (1977).

*See also* Note, *Problems Remaining for the "Generally Accepted" Polygraph*, 53 Boston U. L. Rev 375, 399 (1973).

Another commentator described the reasoning of courts admitting stipulated polygraph evidence as follows:

". . . the stipulation cases do not require that lie detection be proven reliable enough to satisfy the *Frye* test,[104] nor will they admit the tests if either side has refused to enter into a stipulation. Thus, the courts merely permit the prosecution and defense to gamble that the tests will prove favorable to them. In that context, the tests need only be shown to be reasonably reliable as experimental tests.[105] The courts, therefore, enforce stipulations and admit the tests in these cases not because the evidence is regarded as reliable under the *Frye* standard, but rather because under a waiver or estoppel theory all parties have consented to the admission of the test results . . . . For the moment, the stipulation cases stand only for the proposition that the courts will permit the parties to take a reasonable gamble with an experimental device where all agree, but none will be forced to do so.

"[104] *Oliver* was written in terms of *Frye's* 'general acceptance' test, 525 F.2d at 736, yet its holding was limited to the admission of polygraph results on stipulation. Thus, the court required not that

the tests be generally accepted but that they be sufficiently accepted to be admitted under stipulation. *Id.* at 737. Additionally the court limited its general acceptance test to acceptance only among polygraphers, and declared that it was adopting a discretionary rule. *Id.* at 736. In view of the same court's rejection in United States v. Alexander, 526 F.2d 161, 167 n. 6 (8th Cir. 1975), of a general acceptance test limited only to polygraphers and its refusal to allow the admission of test results absent a stipulation, both of the court's latter statements must be construed as either unintended dicta or as relevant solely in the context of stipulations. This construction is corroborated somewhat by a Ninth Circuit stipulation case, Herman v. Eagle Star Ins. Co., 396 F.2d 427 (9th Cir. 1968) (per curiam), which expressly noted that the admissibility of lie detector test results on stipulation did not have any implications as to reliability.

"[105] Annot., 53 A.L.R.3d 1008 (1973)." Comment, *The Truth About the Lie Detector in Federal Courts*, 51 Temple L. Q. 69, 89, 90 (1978).

Under *Stanislawski*, the polygraph evidence became admissible subject to four conditions: the district attorney, defendant and defense counsel sign a stipulation providing for the admission of the evidence at trial; the trial court in the exercise of its discretion admits the evidence; the polygrapher is subject to cross-examination; and the jury is instructed as to the limited function of the evidence. The court set forth the conditions under which polygraph evidence is admissible as follows:

"*As to polygraph tests taken by the defendant* and expert testimony related thereto, polygraph testimony is admissible in this state, as in Arizona under *Valdez*, '. . . to corroborate other evidence of a defendant's participation in the crime charged,' and, 'If he takes the stand such evidence is admissible to corroborate or impeach his own testimony.' The required preconditions or qualifications for the admission of such testimony, in this state as in Arizona under *Valdez*, are as follows:

"(1) That the district attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs, and the examiner's

opinion thereon on behalf of either defendant or the state.

"(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial court, *i.e.*, if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"(a) the examiner's qualifications and training;

"(b) the conditions under which the test was administered;

"(c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"(d) at the discretion of the trial court, any other matters deemed pertinent to the inquiry.

"(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate whether at the time of the examination defendant was telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given.

"*As to polygraph tests taken by a complaining or principal witness,* as in the case before us, or any other witness in a criminal case, the graphs and expert testimony related thereto are admissible, on the issue of credibility, for corroborative or impeachment purposes, only if the same four qualifications are met: . . . ." *Stanislawski, supra,* 62 Wis.2d at 742–743.

In *Stanislawski* the court neither expressly ruled on the reliability of polygraph testing nor expressly discussed the role of the four conditions in justifying admission of the polygraph evidence. It is clear, however, the court concluded that the polygraph examination, when properly conducted and interpreted, is sufficiently indicative of truthful and deceptive responses to justify

its admission into evidence if the parties agree thereto and if the other conditions set forth in *Stanislawski* are met. Because unstipulated polygraph evidence remained inadmissible even after *Stanislawski*, it is apparent that the court viewed each of the *Stanislawski* conditions as having a function, namely, obtaining the parties' waiver of objection to the validity of the basic theory of polygraphs, enhancing the reliability of the test or assuring the integrity of the trial. We shall examine each condition and its function.

Requiring the parties and defense counsel to enter a stipulation encourages discussion and eventual agreement with regard to not only the general subject of the reliability of polygraph testing but also more specific subjects such as the qualifications required of the examiner, the designation of the examiner, the phrasing of the test questions, and the specification of the conditions under which the test is to be given. An obvious concern of both parties to a stipulation is that the polygraph test given to the defendant be conducted in such a manner that the results can withstand a challenge by a party or the trial court. The stipulation can to a certain extent set forth the parties' agreement on certain aspects of the administration of the test. When used in this way, the stipulation can contribute to enhancing the reliability of the test.

Whether or not the parties discuss and agree on the details of the testing to be administered to the defendant, the primary effect of the stipulation is that it operates as a waiver of objection or challenge to the validity of the basic theory of polygraph testing and eliminates the necessity of or the opportunity for the parties to establish a foundation in each case to satisfy the trial court of the basic theory and validity of polygraphs. If either party is not convinced of the reliability of polygraph testing, the party can refuse to stipulate to the test. *State v.*

*Mendoza,* 80 Wis.2d 122, 186, 258 N.W.2d 260 (1977) (Robert Hansen, J. dissenting). As the court further explained in *Robinson v. State,* 100 Wis.2d 152, 162, 301 N.W.2d 429 (1981), "[t]he stipulation requirement set up by this court in *Stanislawski* permits each of the parties to make an independent evaluation of the reliability of polygraph evidence and their willingness to rely on it."

Because the reliability of the test to be administered cannot be determined until after the actual examination has been administered, *Stanislawski* imposed conditions in addition to the stipulation to ensure the reliability of the polygraph test which was actually administered to the individual defendant pursuant to the stipulation and to ensure the integrity of the trial at which the evidence was sought to be admitted. To achieve these ends *Stanislawski* authorized the trial court in its discretion to refuse to accept stipulated polygraph testimony if the trial court was not convinced that the examiner was qualified or that the test was conducted under proper conditions. This condition provides an additional control over reliability.

*Stanislawski* also gave the opposing party the opportunity to cross-examine the examiner with respect to qualifications and training, conditions under which the test was administered, the limitations of and possibilities for error in polygraph interrogation, and, at the discretion of the trial judge, any other matter deemed pertinent to the inquiry. *Stanislawski,* 62 Wis.2d 730, at 742–43. Permitting cross-examination on these subjects provided further impetus for the parties to seek to have the test performed under optimum conditions by a qualified expert of high integrity. In addition, cross-examination on these subjects serves the traditional function of assisting the jury in evaluating the reliability of the proffered evidence.

The fourth condition requiring that a limiting instruction be read to the jury when polygraph evidence was admitted sought to ensure that the jury put the polygraph evidence presented in the proper perspective.[9] The objective was to prevent either a trial by or a trial of the polygraph. This fourth condition, like the others, was also intended to protect the integrity of the trial.

Essentially the latter three *Stanislawski* conditions address the issue of the reliability of the particular test results when the parties had stipulated to the admission of the polygraph evidence, thereby waiving objection to the validity of the basic theory of the polygraph.

When explained in terms of obtaining the parties' waiver of objection to the validity of the basic theory of polygraphs, of enhancing reliability of the proffered polygraph evidence and of ensuring integrity of trial, the four *Stanislawski* conditions appear to be a workable method, albeit one largely dependent on the adversarial process, of injecting a standard of reliability into cases in which admission of polygraph evidence is sought. The measure of the effectiveness of *Stanislawski* in this regard is, of course, reflected not in theory but in the impact of the *Stanislawski* rule on the cases in which it

[9] *See* Instruction 202 entitled *Polygraph Evidence*, Wis J I—Criminal, which states:

"During this trial you have heard the testimony of [name of witness] pertaining to the results of a polygraph test (also known as a lie detector test) taken by [name of person who took the test]. The examiner's testimony by itself does not tend to prove or disprove any element of the crime with which the defendant has been charged, but at most tends to indicate whether [name of person who took the test] was telling the truth at the time he took the polygraph examination. You are not bound by the opinions of any expert. You should consider all of the evidence in the case, and you should consider carefully the opinion evidence with all the other evidence in the case, giving to it just such weight and credit as you deem it is entitled to receive."

was applied. We therefore turn to examine the post-*Stanislawski* decisions in this court.

## C.

The post-*Stanislawski* cases indicate the importance the court attaches to the four *Stanislawski* conditions as means of ensuring the reliability of this evidence and the integrity of the trial. The post-*Stanislawski* cases show the court has consistently demanded strict adherence to the *Stanislawski* conditions.

In several post-*Stanislawski* cases the court has held firm to the principle that unstipulated polygraph evidence is not admissible. In *Gaddis v. State,* 63 Wis.2d 120, 216 N.W.2d 527 (1974), decided ten days after *Stanislawski,* the issue arose whether this court would permit alternatives to the *Stanislawski* stipulation to admit the polygraph evidence. This court refused to do so. Gaddis had sought the admission into evidence of the polygraph and expert opinion testimony of the results of a polygraph test taken by him at his request with the approval of the trial court. The polygraph examination indicated that he was being truthful. After taking the test Gaddis offered to submit to another exam to be conducted by an examiner selected by the prosecution and agreed to stipulate in advance that the test results would be admissible in evidence. Gaddis's offer of proof indicated he would testify at trial as he did. The trial court rejected the offer of proof and refused to admit the polygraph testimony, relying on *State v. Bohner,* 210 Wis. 651, 657–658, 246 N.W. 314 (1933), which was the law at the time of trial. In affirming the trial court's ruling on the polygraph evidence, this court refused to relax or expand the *Stanislawski* rule, saying:

"The procedure here followed—defendant's request, the court's approval and the state crime laboratory ex-

aminer's conducting the test, under sec. 165.79, Stats.— could be viewed as an additional alternative procedure to that authorized in the *Stanislawski Case,* particularly where the defendant offered to submit to another polygraph examination administered by any examiner the prosecutor cared to designate. However, all justices agree that, having determined in *Stanislawski* the proper procedure for the admission of polygraph evidence in this state, we ought not consider additional or alternative procedures so soon after relaxing the forty-year-old total ban on such evidence. Some experience with the by-stipulation-only procedure should be had before additions to it should be considered. . . ." *Gaddis v. State,* 63 Wis.2d at 126.

In *State ex rel. Harris v. Schmidt,* 69 Wis.2d 668, 230 N.W.2d 890 (1975), we concluded that the *Stanislawski* rule was equally applicable to the use of polygraph evidence in probation revocation hearings. Absent compliance with the *Stanislawski* rule the polygraph evidence was inadmissible.

In *Zelenka v. State,* 83 Wis.2d 601, 266 N.W.2d 279 (1978), the defendant sought to introduce the results of a favorable unstipulated polygraph test at a suppression hearing. The evidence of the results of the examination of Zelenka's father was offered to prove that a detective made improper comments after the defendant asked for counsel. No *Stanislawski* stipulation had been signed. Zelenka advocated that we follow the lead of *United States v. Ridling,* 350 F Supp. 90 (ED Mich. 1972), and hold the proffered polygraph results admissible if the defendant would submit to tests by a court appointed polygraphist. This court declined to do so, and citing and quoting *Gaddis, supra,* p. 249, also declined to modify or relax the *Stanislawski* rule requiring a stipulation.

Six months after *Zelenka,* in *Lhost v. State,* 85 Wis.2d 620, 271 N.W.2d 121 (1978), a defendant again sought to introduce an unstipulated favorable polygraph test and challenged on due process grounds the *Stanislawski* rule that evidence is admissible only on stipulation.

Lhost was charged with attempted rape, and the prosecution's case rested on the victim's identification of the defendant as well as substantial physical evidence. The defense had by pretrial motion requested a polygraph test and the court ruled that no test would be admissible unless a stipulation was filed. No *Stanislawski* stipulation had been executed, and the trial court refused to admit the polygraph evidence.

Lhost argued that the favorable polygraph results should be admissible without stipulation and that the requirement that the state stipulate to the introduction of the evidence violated his due process right to compulsory process because a prosecutor could bar him from introducing probative and relevant evidence which may be exculpatory. The court reviewed the prior cases raising this issue, *e.g., Gaddis, supra* p. 249, *State ex rel. Harris, supra* p. 250, and *Zelenka, supra* p. 250, and concluded that these cases "indicate a clear choice by this court not to withdraw from its position in conditioning polygraph admissibility upon a prior stipulation." *Lhost, supra,* 85 Wis.2d at 634. The *Lhost* court, after reviewing the *Stanislawski* decision, recent cases from other jurisdictions and recent studies and commentaries on the polygraph, concluded that "unstipulated polygraph exams are not sufficiently reliable so as to mandate the abandonment of our holding in *Stanislawski*." *Lhost, supra,* 85 Wis.2d at 645. Thus the court specifically placed reliance on the stipulation as a means of enhancing the reliability of polygraph evidence to the point where otherwise inadmissible evidence becomes admissible. The court referred to studies which indicated that a test given without a stipulation is possibly less accurate than one given with a stipulation.[10] The court explained the value of the stipulation as follows:

[10] There does not seem to be general acceptance that a pre-test stipulation enhances the reliability of the test. *See McMorris v. Israel,* 643 F.2d 458, 463, n. 14 (7th Cir. 1981).

"One of the most cogent studies was done by Dr. Martin Orne in his article, 'Implications of Laboratory Research for the Detection of Deception,' 2 Polygraph 169 (1973). In addressing the problems to the accuracy of lie detector results when a stipulation is required for admissibility and the test is taken prior to stipulation at the behest of defense counsel, he makes the following points:

" 'Whereas the usual polygraph examination is carried out in a situation where the polygrapher is at arm's length—in the employ of a law enforcement agency, a potential (or actual) employer or in some similar relationship, where his decision would inevitably have a direct effect on a suspect's future—the context in which the friendly polygrapher carries out his test is inevitably different. In the latter case the suspect realizes that his attorney has employed the polygraph examiner to help in the preparation of his defense. For the innocent person this may matter relatively little; however, for the guilty individual it alters the situation considerably. The guilty individual when tested by a friendly polygrapher knows that the results of the test *if he is found deceptive* will not be used against him. The only kind of findings which his attorney would utilize are ones where his innocence is being corroborated by the polygraph. As a consequence, the client's fears about being detected are greatly reduced. As we have been able to show in the laboratory, and as is acknowledged by all polygraph experts, *a suspect's fear of detection is the major factor in assuring his augmented physiological response while lying. It is precisely this aspect of the situation which is most dramatically altered when the polygraph is employed by the defendant's attorney. The respect and perhaps even deference accorded to the client by the polygraph examiner will tend to convince the client that the polygrapher is really attempting to help his cause and thereby make him less afraid and less detectable, even if he is guilty.'* pp. 194–195. (Emphasis supplied.)" *Lhost v. State, supra*, 85 Wis.2d at 642–643.

The court considered and rejected in *Lhost* the argument that unstipulated polygraph examinations are as reliable as forensic tests such as ballistics test evidence,

blood tests and fingerprint identification. The court, distinguishing the polygraph exam from forensic testing and quoting Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials,* 15 Am. Crim. L. Rev. 29 (1977), set forth the variety of subjective and objective factors which affect the polygraph result, nearly all of which cannot be gauged until the test is given. *Lhost v. State,* 85 Wis.2d 620 at 644–645.

The court recognized that the authoritative studies "are in as sharp dispute today as they were when *Stanislawski* was written in 1974." *Id.* at 640–641. Despite the serious reservations the court expressed in *Lhost* about the inherent reliability of polygraph testing and about the usefulness of the polygraph in a court of law, as distinguished from its usefulness as an investigative tool, the court concluded that it would abide by the *Stanislawski* rule, *Lhost, supra,* 85 Wis.2d at 648. The *Lhost* court viewed Lhost's reliance on *Washington v. Texas,* 388 U.S. 14 (1967), and *Chambers v. Mississippi,* 410 U.S. 284 (1972), to support his position that requiring a stipulation for admissibility is unconstitutional as misplaced because those cases did not require that inherently unreliable evidence or evidence of questionable validity, such as an unstipulated polygraph exam, be admitted as part of the right to compulsory process.[11]

More recently, in *Robinson v. State,* 100 Wis.2d 152, 301 N.W.2d 429 (1981), the court, adhering to the rule requiring strict compliance with the *Stanislawski* stipulation requirements, found no error in the Milwaukee

---

[11] *Accord, see State v. Conner,* 241 N.W.2d 447, 457–458 (Iowa 1976). *Contrary, see State v. Dorsey,* 88 N.M. 184, 539 P.2d 204, 205 (1975).

For a discussion of the due process argument, *see* Comment, *Compulsory Process and Polygraph Evidence: Does Exclusion Violate a Criminal Defendant's Due Process Rights?,* 12 Conn. L. Rev. 324 (1980); Note, *Admission of Polygraph Results: A Due Process Perspective,* 55 Ind. L. J. 157 (1979–80).

county trial court's refusal to admit the results of a polygraph examination which had been stipulated to in another county relating to another charge. The facts of the case are somewhat unusual. In March 1977 charges against Robinson were dismissed in Waukesha county on the request of the Waukesha county prosecutor based on the outcome of a stipulated polygraph report. Robinson was charged in Milwaukee county on forgery charges related to those dismissed in Waukesha county. He sought to introduce the results of the stipulated Waukesha polygraph test into the trial in Milwaukee county. The court held that the stipulation entered into in Waukesha county by a Waukesha prosecutor in a Waukesha county prosecution for three forgeries did not satisfy the *Stanislawski* requirements in a prosecution by a different prosecuting attorney for other forgeries in another county. *Robinson*, 100 Wis.2d at 162. In addition, the court determined that even if it were to hold that the stipulation of one district attorney could bind the district attorney of another county the results of the test stipulated to in Waukesha county were not relevant to the Milwaukee county charges since the relevant questions related only to the Waukesha county offense.

As these cases show, the court has steadfastly refused to consider alternative procedures to the stipulation or to relax the requirements of the stipulation. If the stipulation did not strictly adhere to the *Stanislawski* requirements, the polygraph evidence was not admissible. This rule of strict compliance reflects the court's concern that polygraph evidence be admissible only under limited, controlled conditions.[12]

The constitutionality of permitting the prosecutor to bar admission of polygraph test results by refusing to

---

[12] There are other cases in which the court determined that it was error to admit polygraph evidence on a stipulation which did not comply fully with *Stanislawski*. In *State v. Craft*, 99 Wis.2d 128, 135, 298 N.W.2d 530 (1980), this court held that a stipulation entered into before the defendant was arrested and charged was

stipulate to the polygraph test was challenged in the Seventh Circuit Court of Appeals in *McMorris v. Israel,* 643 F.2d 458 (7th Cir. 1981). The Seventh Circuit Court of Appeals held that the prosecutor's right to veto the polygraph test in that case without explanation was constitutionally impermissible. McMorris had been convicted in Wisconsin of strong-armed robbery. He challenged the constitutionality of the *Stanislawski* rule denying admission of the polygraph test to which the prosecutor, without explanation, refused to stipulate.

The federal court of appeals, citing *Washington v. Texas,* 388 U.S. 14 (1967), *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973), and *Hughes v. Mathews,* 576 F.2d 1250, 1258 (7th Cir. 1978), *cert. dismissed,* 439 U.S. 801 (1978), and noting that the right of a defendant to present relevant evidence is not absolute, concluded that its task was "to evaluate the exculpatory significance of the proffered polygraph evidence and then to balance it against the competing state interest in the procedural rules that prevented the defendant from presenting this evidence at his trial." 643 F.2d at 461.

Addressing the exculpatory significance of the polygraph examination, the seventh circuit noted that in *Mc-Morris* the state's case rested on the credibility of the

not an effective *Stanislawski* stipulation and was not admissible as evidence at trial.

In *State v. Streich,* 87 Wis.2d 209, 274 N.W.2d 635 (1979), we considered whether the court erred in admitting polygraph testimony on the basis of an oral stipulation made on the record in open court rather than upon a stipulation as required by *Stanislawski.* Under the facts of that case the court held that any error resulting from the failure to follow the *Stanislawski* rule "was not reversible error." *Streich, supra,* 87 Wis.2d at 220.

In *State v. Marshall,* 92 Wis.2d 101, 284 N.W.2d 592 (1979), the court would not, for a number of reasons including the absence of a *Stanislawski* stipulation, reverse the trial court ruling excluding polygraph evidence.

In *Pickens v. State,* 96 Wis.2d 549, 574, 292 N.W.2d 601 (1980), an oversight in one of the stipulations was not viewed as fatal.

complaining witness's identification and the defendant's case rested on the defendant's credibility. The defendant testified and denied participation in the crime. There was no other significant evidence. The federal court of appeals concluded that in the circumstances of the case, which are similar to those in *Stanislawski, see* note 7 *supra,* the evidence of a favorable polygraph examination would have been of great importance to the defendant and that the evidence was materially exculpatory within the meaning of the constitution. As to the procedural rules that prevented the defendant from introducing the polygraph test at trial, the seventh circuit reached three conclusions: First, the federal court of appeals characterized Wisconsin as having a liberal attitude regarding the admissibility of polygraph evidence and commented that recent developments seem to have made the polygraph evidence more reliable so that "even the most ardent detractors from the validity of the polygraph evidence concede a degree of reliability of 70 percent or higher for properly administered examinations." 643 F.2d at 462. Second, the seventh circuit concluded that although the matter is open to debate, the *Stanislawski* pre-test stipulation requirement is defensible on the ground that as a matter of common sense the thesis that a pre-test stipulation increases the reliability of the test is quite reasonable. Third, the seventh circuit concluded that Wisconsin's allowing the prosecutor, as an adversary, "to exercise an unrestricted veto—unrelated on the record to any reasons appropriate to the stipulation requirement—over the significantly exculpatory polygraph evidence in the instant case" violates due process.[13] The seventh circuit remanded the action to the district court

---

[13] *See also Jackson v. Garrison,* 495 F. Supp. 9 (WDNC 1979), in which the court held that the North Carolina's total bar on the defendant's introducing exculpatory polygraph evidence deprived the defendant of his constitutional right to a fair trial.

to assess whether the prosecutor had valid reasons for refusing to enter into the stipulation offered by the defendant.

Although the analysis in *McMorris* is logical and cogent, it is based on a mistaken interpretation of *Stanislawski*. The seventh circuit concluded that "thesis underlying Stanislawski [is] that the results of stipulated polygraph examinations are competent evidence . . .[and that] the evidence is inadmissible in the absence of the stipulation because it is not sufficiently reliable without the stipulation." 643 F.2d at 461–463. The seventh circuit thus distinguishes Wisconsin's *Stanislawski* approach from the approach of a pure "consent" state in which the inadmissible stipulated evidence is not regarded as competent.

The seventh circuit erred in failing to recognize that this court did not decide in *Stanislawski* whether stipulated or unstipulated polygraph evidence was reliable under the *Frye* standard or under any other standard. *Stanislawski* is, contrary to the interpretation of the Seventh Circuit Court of Appeals, based substantially on principles of consent and waiver rather than on the principles of scientific reliability. The *Stanislawski* decision reflects this court's judgment of both the recent scientific developments which seem to have made the polygraph more reliable and the continuing significant dispute as to the theoretical reliability of the test and its usefulness in a court of law.

Although the requirement that only stipulated polygraph evidence be admitted appears simple and straightforward, the application of the rule engendered problems in addition to the due process question. Four cases—*McAdoo v. State,* 65 Wis.2d 596, 223 N.W.2d 521 (1974), *Turner v. State,* 76 Wis.2d 1, 250 N.W.2d 706 (1977), *State v. Schlise,* 86 Wis.2d 26, 271 N.W.2d 619 (1978), and *Barrera v. State,* 99 Wis.2d 269, 298 N.W.2d 820

(1980)—all involved the admissibility of confessions obtained with the assistance of the polygraph operator. The parties in these cases had not entered into a *Stanislawski* stipulation. These cases raised the issue of what constitutes the polygraph examination. If the defendant's statement was part of the polygraph examination it was not admissible because there was no stipulation; if the defendant's statement was part of an interrogation and not part of the polygraph examination, the admissibility of the statement is governed by the usual rules governing admissibility of confessions.

The difficulty in making a logical separation between polygraph testing and custodial interrogation will continue to arise as long as the court prohibits or restricts the admission of polygraph evidence. Viewed together, however, these cases show the application of the *Stanislawski* stipulation requirement as an exclusionary rule which may be asserted by a defendant or the state to prevent admission of polygraph evidence or evidence obtained in conjunction with the polygraph test.

*State v. Mendoza,* 80 Wis.2d 122, 258 N.W.2d 260 (1977), presented a different question. The parties had entered into a stipulation and the issue became under what circumstances and in what manner a party could challenge stipulated polygraph evidence. *Mendoza* revealed the limited effectiveness of the stipulation and the other *Stanislawski* conditions as means to ensure the competency and integrity of the examiner, the reliability of the administration of the test and the interpretation of the test results, and the integrity of the trial.

Before admitting the stipulated polygraph evidence, the *Mendoza* trial court *sua sponte* held a hearing on the admissibility of the test results. In *Stanislawski* we had stated as the second condition that the admissibility of the polygraph evidence was within the discretion of the trial court. The trial court admitted the examiner's testi-

mony which interpreted the test results to indicate that the defendant was untruthful. At trial, defense counsel sought to present witnesses who would testify respecting the examiner's qualifications; the manner in which the polygraph examination was conducted; the examiner's interpretation and scoring of the polygraph examination; and the reliability of the polygraph in the detection of deception. The trial court refused to permit defendant's expert witnesses to testify and also refused defendant's request after the close of testimony that he be permitted to present evidence that the examiner acknowledged that he had scored the data improperly. Although the district attorney recommended that "justice would best be served" by the trial court instructing the jury not to consider the polygraph evidence, *Mendoza, supra,* 80 Wis.2d at 160, the trial court refused to accede to the district attorney's request.

The *Mendoza case* graphically illustrates that the stipulation itself does not ensure that the polygraph will be administered properly by a qualified expert. While parties to a *Stanislawski* stipulation may be viewed as having waived their otherwise valid objection to the validity of the basic theory of polygraph testing and the reliability of polygraph evidence by entering into the stipulation, the parties are not held to have waived their objection to the reliability of the particular test since this reliability cannot be assessed fully prior to the examination. The parties' decision to enter into a stipulation for the admission of polygraph evidence is to an extent a calculated risk. The risk, however, does not under *Stanislawski* include that the evidence will be admitted although the test was not administered properly or that the results were not interpreted correctly.

The *Mendoza* court sought to ensure the reliability of the test before its results are presented to the jury by further defining the second and third *Stanislawski* conditions, namely the trial court's part in admitting the

polygraph evidence on stipulation and the parties' function in challenging the validity of the examiner's testimony.

We concluded in *Mendoza* that the pretrial hearing before the trial court was the proper occasion for the parties to offer evidence to persuade the trial court as to the reliability and the admissibility of the proffered polygraph evidence despite the stipulation. "The appropriate time to challenge that opinion is at the admissibility hearing. This will serve the purpose of informing the court and at the same time preventing the jury from being distracted by detours into collateral proof on scientific evidence, the fundamental validity of which both parties have already accepted." *Mendoza,* 80 Wis.2d at 161.

This court emphasized the trial court's responsibility in the process of admitting polygraph evidence. Notwithstanding the stipulation of the parties, the trial court has, we said, the discretion to admit or reject the proffered evidence. If the trial court admits stipulated polygraph evidence, this court instructed the trial court to continue to exercise discretion to prevent the trial from becoming derailed and detoured into collateral issues on the polygraph evidence and at the same time to allow sufficient leeway for the jury to determine what corroborative weight and effect the examiner's testimony should be given. *Mendoza, supra,* 80 Wis.2d at 162.

This straightforward recognition that the stipulation failed to ensure reliability in the administration of the test and that further inquiries were appropriate before admitting the stipulated evidence resulted in a more structured *in limine* admissibility hearing and an emphasis on the weighty responsibility of the trial court in determining admissibility. The significance of the admissibility hearing was subsequently confirmed in *McLemore v. State,* 87 Wis.2d 739, 275 N.W.2d 692

(1979). We concluded in *McLemore* that the trial court erred in refusing to allow the defendant to put on expert witnesses to impeach the testimony of the polygraph examiner at the hearing on admissibility conducted by the trial court outside the presence of the jury. We held that the defendant's right to use experts at the voir dire examination of the examiner "was not subject to the discretion of the trial court." *McLemore, supra,* 87 Wis. 2d at 749. Neither *Stanislawski,* nor *Mendoza,* nor *McLemore,* however, suggested standards or guidelines for the trial court to use in determining, after the hearing, whether to admit the stipulated polygraph evidence.

The problem raised in *Mendoza* was not, however, solely a question of admissibility of stipulated polygraph evidence by the trial court. At trial Mendoza sought to call his own polygraph experts to testify before the jury. In *Mendoza* this court refused to permit this procedure because it raised the substantial possibility of shifting the focus of the trial from the question of the defendant's guilt or innocence to the reliability of the polygraph. The court read the third *Stanislawski* condition as limiting the defendant to impeaching the testimony of the polygraph examiner through cross-examination. We upheld the trial court's limiting the defendant's attack on the stipulated polygraph evidence in the trial to the jury to cross-examination of the polygraph witness as to " (a) the examiner's qualifications and training; (b) the conditions under which the test was administered; (c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and (d) at the discretion of the trial court, any other matters deemed pertinent to the inquiry." *Stanislawski, supra,* 62 Wis.2d at 742–743. Both *Mendoza* and *Stanislawski* have been interpreted by this court to mean that if the parties enter into a *Stanislawski* stipulation on the admission of the polygraph, the parties have agreed to forego their usual

opportunity to impeach expert opinion by calling other expert witnesses.[14]

The solutions presented in *Mendoza* to make the *Stanislawski* conditions workable were not satisfactory to several members of the court. Three justices in *Mendoza* (Justices Heffernan, Day and Abrahamson) would have allowed the defendant to call other experts to impeach the examiner's opinion. While acknowledging that the state's complaint that a battle of the experts might ensue, these three justices noted that *"Stanislawski* approved the use of polygraph evidence largely because it was found comparable in reliability to other types of evidence admitted in the form of expert opinion" and the "principles of general application to expert testimony should be applicable here." The problem of the battle of the experts "is present in every area of expert testimony and the best solution is the discerning judgment of the jury." *Mendoza, supra,* 80 Wis.2d at 163. A fourth justice (Justice Connor Hansen), writing in dissent in *Mendoza,* expressed the opinion that "the interest of judicial administration could best be served if we were to hold that the results of [a polygraph] examination were not admissible evidence." *Mendoza, supra,* 80 Wis.2d at 190.

In *McLemore, supra* 87 Wis.2d at 749, the dissatisfaction of the court with the course which the *Stanislawski* decision had taken was more evident. Three justices (Justices Connor Hansen, Day and Callow) stated that they would overrule *Stanislawski* and hold polygraph evidence inadmissible.

Relying primarily on Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials,* 15 Am. Crim. L. J. 29 (1977), which this court

---

[14] "Permitting the defense to have an independent examiner challenge the results of the stipulated examination in the presence of the jury is contrary to the rule of *Stanislawski*, and our holding in *Mendoza." State v. Streich,* 87 Wis.2d 209, 219, 274 N.W.2d 635 (1979). *See also State v. Seebold,* 111 Ariz. 423, 531 P.2d 1130, 1132 (1975), limiting impeachment to cross-examination.

had quoted with approval in *Lhost, supra* p. 251, the dissenting justices focused on two problems in the admissibility of polygraph evidence. The first was the subjective nature of the test. The problem of subjectivity reflects, of course, a question concerning the basic reliability of the polygraph. While the court saw the second *Stanislawski* condition, *i.e.,* the pre-trial admissibility hearing, as a means of asserting judicial control to protect against the danger of unreliable polygraph evidence, the dissents' concern was whether the polygraph could, under any circumstances, be considered reliable evidence in a court of law.

The second problem the dissent emphasized was the danger that the jury would be misled to rely too heavily on the polygraph testimony as "expert" opinion as to the defendant's truthfulness. Thus the efficacy of the third *Stanislawski* condition (limiting impeachment to cross-examination) and of the fourth *Stanislawski* condition (the jury instruction) was seriously questioned. The three dissenting justices concluded that "polygraphy in its present state may be useful as an investigative tool, but that its limitations and potential for misleading factfinders are such that it should not be part of [the] evidentiary system." *McLemore, supra,* 87 Wis.2d at 751.[15]

## IV.

In light of our experience under the *Stanislawski* rule and the recent experiences of other jurisdictions with polygraph evidence we must now determine whether the

---

[15] The legal system's requirements for assessing accuracy and reliability differ significantly from those of the scientific or the business community. Evidence upon which the business community bases its decisions may not be adequate in the legal system. For legislative policy as to "honesty tests," *see, e.g.,* secs. 111.31(4), 111.32, 111.326, Stats. 1979–80.

*Stanislawski* rule provides an adequate means by which the trial courts can administer the admission of polygraph evidence and whether the *Stanislawski* rule ought to continue to govern the admission of polygraph results in the courts of this state.

Before considering the *Stanislawski* conditions, we note that at least one state apparently admits polygraph testimony on the same basis as other scientific evidence,[16] that many jurisdictions continue to refuse to admit polygraph evidence[17] and that several jurisdictions, including Wisconsin, admit polygraph evidence under prescribed conditions.[18]

---

[16] *See, State v. Dorsey*, 88 N.M. 184, 539 P.2d 204 (1975), requiring that the proponent of polygraph evidence establish the qualifications of polygraph operator, the reliability of testing procedure, and the validity of tests made on the subject. *See also State v. Bell*, 90 N.M. 134, 560 P2d 925 (1977).

[17] *See, e.g., Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970); *State v. Antone*, 615 P.2d 101, 109 (Haw. 1980); *People v. Monigan*, 72 Ill. App.3d 87, 390 N.E.2d 562, 567 (1979); *Conley v. Commonwealth*, 382 S.W.2d 865 (Ky. 1964); *State v. Corbin*, 285 So. 2d 234, 239 (La. 1973); *State v. Gagne*, 343 A.2d 186, 192 (Me. 1975); *Akonom v. State*, 40 Md. App. 676, 394 A.2d 1213 (1978); *People v. Barbara*, 400 Mich. 352, 255 N.W.2d 171 (1977); *Jordan v. State*, 365 So.2d 1198, 1204 (Miss. 1978); *State v. Beachman*, 616 P.2d 337, 339 (Mont. 1980); *State v. Biddle*, 599 S.W.2d 182, 187 (Mo. 1980) (en banc); *State v. Steinmark,* 195 Neb. 545, 239 N.W.2d 495, 497 (1976); *State v. LaForest*, 106 N.H. 159, 207 A.2d 429 (1964); *Fulton v. State*, 541 P.2d 871 (Okla. Cr. App. 1975); *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875, 883 (1976); *State v. Watson*, 248 N.W.2d 398 (S.D. 1976); *Robinson v. State*, 550 S.W.2d 54, 59 (Tex. Cr. App. 1977); *Jones v. Commonwealth*, 214 Va. 723, 204 S.E.2d 247, 248 (1974); and *State v. Frazier*, 252 S.E.2d 39, 43 (W. Va. 1979).

Some federal circuits permit the introduction of polygraph evidence in the discretion of the trial court. *See, e.g., United States v. Marshall*, 526 F.2d 1349, 1360 (9th Cir. 1975); *United States v. Oliver*, 525 F.2d 731, 737 (8th Cir. 1975), cert. den. 424 U.S. 973 (1976); *United States v. Bursten*, 560 F.2d 779, 785 (7th Cir. 1977).

[18] *See, e.g., Williams v. State*, 378 A.2d 117, 120 (Del. 1977), cert. den. 436 U.S. 908 (1978); *Moore v. State*, 299 So. 2d 119

Several jurisdictions which do not admit polygraph evidence view the polygraph as lacking scientific reliability. On the basis of the record before us the court is not now prepared to say that the polygraph test results are acceptable expert scientific evidence which should be subject to the same rules of evidence as other expert scientific evidence or that polygraph evidence is so unreliable that it cannot be admitted under any circumstances.

We are also aware that some jurisdictions which do not admit polygraph evidence view the prejudicial effect of the evidence on the integrity of the trial as outweighing any probative value of the evidence. For example, the Louisiana Supreme Court recognized that polygraph evidence properly obtained "is as reliable as other kinds of scientific evidence accepted routinely by courts" and has "high probative value," but concluded that "it shall be the judicial policy of Louisiana to exclude polygraph evidence in criminal trials at this time" because the probative value is outweighed by the reasons for its exclusion. *State v. Catanese*, 368 So.2d 975, 981 (La. 1979). The recent experiences of this court and other courts with polygraph evidence and with the *Stanislawski* conditions illustrate the merit of the position that the burden on the trial court to assess polygraph evidence may outweigh any probative value the polygraph evidence may have.

The issue before the court now is whether in theory and in application the four *Stanislawski* conditions which are designed to achieve the court's objectives of having the

(Fla. App. 1974); *State v. Chambers*, 240 Ga. 76, 239 S.E. 2d 324 (1977); *Owens v. State*, 373 N.E.2d 913 (Ind. App. 1978); *State v. Conner*, 241 N.W.2d 447, 457 (Iowa 1976); *State v. Lassley*, 218 Kan. 758, 545 P.2d 383, 385 (1976); *Commonwealth v. Allen*, 377 Mass. 674, 387 N.E.2d 553 (1979); *Corbett v. State*, 584 P.2d 704 (Nev. 1978); *State v. McDavitt*, 62 N.J. 36, 297 A.2d 849 (1972); *State v. Milano*, 297 N.C. 485, 256 S.E.2d 154, 162 (1979); *State v. Souel*, 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978); *State v. Ross*, 7 Wash. App. 62, 497 P.2d 1343 (1972); *Cullin v. State*, 565 P.2d 445, 453–459 (Wyo. 1977).

parties waive objection to the validity of the basic theory of polygraphs, of enhancing the reliability of the proffered polygraph evidence, and of ensuring the integrity of the trial justify admissibility of polygraph evidence. We shall consider each of the four conditions in turn.

The admission-on-stipulation approach has been criticized by commenators and courts as being theoretically unsound and a legal paradox. The criticism is that ordinarily a stipulation can admit facts but not change the law. The law is that polygraph evidence is not admissible. Yet under *Stanislawski* polygraph evidence not reliable enough for admission during trial becomes admissible by virtue of the stipulation. The stipulation has thus changed the law. Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System*, 26 Hastings L. J. 917, 954–956 (1975).

In *State v. Frazier*, 252 S.E.2d 39, 45–46 (W. Va. 1979), the West Virginia Supreme Court rejected the *Stanislawski* stipulation approach reasoning, *inter alia*, that the stipulation did not cure the unreliability of the evidence:

"There are several problems arising from the *Valdez* concept. Its central thesis of admissibility is the written stipulation. Yet it is clear that by written stipulation parties cannot make evidence admissible that otherwise would be inadmissible. In other words, a written stipulation agreeing to the introduction of certain evidence is not the legal basis for its admissibility. *Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970) (polygraph test stipulation) ; 29 Am. Jur.2d Evidence sec. 13.

"It is true that *Valdez* and its progeny suggest that the examiner's testimony concerning the polygraph test bears upon the truthfulness of the subject's testimony, and therefore his credibility. Yet, if this were the real basis for its admissibility, there would be no need for the written stipulation, since it is generally held that any witness' credibility may be impeached. . . . [Citations omitted.]

"However, if the test bore merely on the issue of credibility, it would ordinarily not be admissible unless the defendant took the witness stand. Most cases that follow the *Valdez* stipulation, and *Valdez* itself, do not discuss, much less differentiate between, whether the test can be introduced in the state's case-in-chief or only for the impeachment of the defendant. . . .

"It is difficult to perceive how the written stipulation of the fact that the polygraph test can be admitted to impeach the credibility of the defendant can furnish any sound legal theory for the use of the polygraph in the state's case-in-chief. An even more difficult problem is encountered if we attempt to utilize these theories when the defendant seeks to admit a favorable polygraph test taken under a *Valdez* stipulation. If we follow the *Valdez* rationale that the polygraph test is not independent proof of any fact but merely bears on credibility, the defendant ordinarily cannot introduce his own extrajudicial exculpatory statements. They are generally thought to be too self-serving. [Citations.] We have not encountered a case which discusses this point. Obviously the defendant gains little from a *Valdez* stipulation if he cannot introduce a favorable polygraph test."

A similar view was expressed in *Akonom v. State,* 40 Md. App. 676, 394 A.2d 1213, 1216 (1978), as follows:

"We find these cases unpersuasive and would venture to suggest that they are guilty of putting the cart before the well-known horse. As we see it, the crucial issue is whether, as a matter of law, this type of evidence is sufficiently reliable or trustworthy. It cannot logically be argued that a stipulation enhances in any significant way the inherent reliability of evidence produced by a so-called scientific process or art."

*See also Pulakis v. State,* 476 P.2d 474, 479 (Alaska 1970).

In *People v. Monigan,* 72 Ill. App3d 87, 28 Ill. Dec. 395, 390 N.E.2d 562, 563 (1979), the Illinois court of appeals set forth the following seven reasons justifying the inadmissibility of polygraph examinations despite the stipulation of the parties:

"(1) A polygraph test is not independent proof of any fact, but merely bears on the credibility of the defendant.

"(2) The admission of the polygraph test has such an impact on the jury that the truth seeking function of the trial will be destroyed.

"(3) Unreliable evidence should not play a major part in the conviction or acquittal of a person charged with a crime.

"(4) A stipulation cannot make unreliable evidence reliable.

"(5) A stipulation that makes unreliable evidence admissible is contrary to public policy.

"(6) A stipulation that unreliable evidence is reliable is really a stipulation of law and therefore invalid.

"(7) It would be inconsistent for a court to refuse to admit polygraph tests into evidence because they are unreliable and then admit them into evidence by stipulation."

In Oklahoma, the court of appeals reversed a line of cases admitting polygraph evidence on stipulation and determined that the potential unreliability of the polygraph dictated its total exclusion. *Fulton v. Oklahoma,* 541 P.2d 871 (Okla. Cr. 1975). *See also Commonwealth v. Pfender,* 421 A.2d 791 (Pa. Super. 1980); *Robinson v. State,* 550 S.W.2d 54 (Tex. Crim. App. 1977).

Essentially the view taken by the critics of the admit-on-stipulation approach is that the stipulation does little if anything to enhance the reliability of the polygraph evidence; the parties have merely agreed to the admission of the polygraph evidence thereby waiving their objection to the validity of the basic theory of the polygraph. We view this criticism as a serious challenge to the soundness of admitting polygraph evidence on the basis of a stipulation of the parties. The thesis of these critics, though perhaps contrary to the view of this court in *Stanislawski,* is essentially confirmed by our decisions in *Lhost* and in *Mendoza.* Although in *Lhost, supra* p. 251, we quoted studies that indicated that an unstipulated examination was probably less accurate than one subject

to stipulation, we did not recognize the stipulated polygraph examination as necessarily reliable. Although the parties in *Mendoza* executed what appeared to be a thoughtful stipulation specifying the examiner, the time and place of examination and perhaps even some test questions, the stipulation proved ineffective to guarantee a reliable examination, because, as we have stated, a stipulation cannot cover all aspects of the test which might affect its reliability.

In addition to our concern whether the stipulation functions to enhance reliability, we are also concerned, as was the Seventh Circuit Court of Appeals as well as other courts, with the validity of allowing the prosecutor to veto the defendant's wish to introduce polygraph evidence by refusing to execute a stipulation. The justification for a state veto bears a direct relation both to the demonstrated ability of a stipulation to enhance the reliability of the polygraph evidence and to the availability of other means to enhance reliability to the same degree. In *Lhost* we recognized that the reliability of the test was enhanced if the defendant was limited in choosing the examiner and if the defendant knew that the results would be used at trial. This effect, however, could be achieved by the adoption of a technique similar to one used in Massachusetts, namely that upon the request of the defendant the trial court may authorize the appointment of an examiner to administer a polygraph test, the results of which would be admissible at trial after a close and searching inquiry by the trial court.[19] Such a pro-

[19] *See Commonwealth v. A. Juvenile,* 365 Mass. 421, 313 N.E.2d 120 (1974); *Commonwealth v. Vitello,* 376 Mass. 426, 381 N.E.2d 582 (1978).

In *Commonwealth v. Stewart,* 375 Mass. 380, 377 N.E.2d 693, 697 (1978), the Supreme Judicial Court of Massachusetts held that the defendant could not first take the test and then move its admission. "The first step in this procedure is that the defendant 'agree in advance that the results would be admissible irrespective of the outcome of the tests.'" *Id.* 375 Mass. at 384.

cedure would enhance the reliability of the test without giving the prosecuting attorney an absolute veto over the defense's trial strategy and would avoid due process problems. The Massachusetts solution, however, while helpful in resolving the due process issue, would put additional burdens on the trial courts.

We conclude that the stipulation adds little to the reliability of polygraph evidence and that its limited contribution to reliability could be ensured through the "Massachusetts procedure" which is less restrictive on the defendant's use of polygraph evidence but which is more burdensome on the trial courts. It appears that this court has viewed the stipulation primarily as stating the parties' acceptance of the validity of polygraphs *per se* and the parties' waiver of the need to introduce evidence laying the foundation otherwise necessary to introduce polygraph evidence. Thus if the reliability of particular polygraph evidence is to be enhanced or assured by the retention of the *Stanislawski* conditions, the enhancement or assurance is to be accomplished not by the stipulation but by the other *Stanislawski* conditions.

We are also concerned with the second *Stanislawski* condition. As presently stated, this condition does not make clear whether the trial court is required to hold a hearing *sua sponte* in every case to determine whether the polygraph test evidence is admissible or whether the trial court must hold such a hearing and make such a determination only on the motion of a party who objects to admissibility.

If under *Stanislawski* the trial court has the power to reject the proffered stipulated evidence if not convinced that the examiner is qualified and that the test was conducted under proper conditions, it would appear, although this court does not now so decide, that a pre-trial hearing on admissibility may be mandatory. If the trial court is to police the admission of the stipulated poly-

graph examination and to exercise its discretion *sua sponte* in the admission of the stipulated polygraph evidence, then the trial court must make a careful inquiry, on the record, as to such matters as the examiner's qualifications, including his or her training and experience, the conditions under which the test was administered, the psychological and medical assessment of the defendant as a suitable examinee, the conduct of the examination, and the interpretation of the results. Only after testimony on such matters could the trial court conclude whether the evidence was admissible.

The decision whether to admit the stipulated evidence rests in the discretion of the trial court. That the trial court has discretion does not mean that the choice is left to the trial court's inclination, whim or emotion or that the trial court is "unfettered by meaningful standards or shielded from thorough appellate review." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416 (1975). Decisions left to the trial court's discretion are left to the trial court's judgment, and the exercise of the trial court's judgment must be guided by sound principles. "The term 'discretion' contemplates a process of reasoning which depends on facts that are of record or reasonably derived by inference from the record and a conclusion based on logical rationale founded on proper legal standards." *Christensen v. Economy Fire & Casualty Co.,* 77 Wis.2d 50, 55–56, 252 N.W.2d 81 (1977). Requiring the trial court to articulate reasons for its decision affords a safeguard against careless or arbitrary action and fosters consistency in decision making.

Apparently some trial courts have held hearings *sua sponte* and others have not. In *Mendoza* the trial court held a hearing *sua sponte.* In *McLemore* the trial court permitted voir dire examination of the examiner's qualifications out of the presence of the jury before the examiner was permitted to testify. In the instant case,

the trial court reviewed the voluntariness of defendant's executing the stipulation but admitted the stipulated polygraph evidence without any testimony relative to the qualifications of the examiner or the conditions of the examination. If these cases are any indication of the manner in which the second *Stanislawski* condition has functioned, we must conclude that the condition has failed to ensure that the trial court will exercise control over reliability of stipulated polygraph evidence through the exercise of its discretion.

In making this comment we intend no criticism of the trial courts which sought to deal with stipulated polygraph evidence with only the limited guidance to be gleaned from *Stanislawski* and later cases. The case law at present provides no standards or guidelines to aid the trial court in determining whether the expert witness is qualified, whether the defendant is a suitable subject, whether the methods used in conducting and interpreting the test are valid, or whether the evidence should be limited to certain types of cases, such as non-jury cases, perjury cases, and so forth. Under such circumstances, the burden on the trial court to decide in each case whether to admit the stipulated polygraph evidence is substantial.

In *United States v. Urquidez*, 356 F. Supp. 1363 (C.D. Cal. 1973), the federal district court, after spending three full days hearing testimony of experts concerning the polygraph instrument, the technique of administering the test, the validity of the test administered to the defendant and the interpretation of the results, and after having read numerous published articles about polygraphy and transcripts of testimony of experts in another case, concluded that although the polygraph has much merit, it should not be used in court. Recognizing that a litigant could challenge the proffered results of a test on the basis of the motivation of the subject, the subject's physical and mental condition, the competence,

integrity and attitude of the operator, the wording of the relevant questions, the appropriateness of the control questions, and the reading of the graphs, the district court concluded that the administrative burden on the court outweighed the probative value of the test. The district court summarized its reasoning as follows:

"Although not emphasized in this opinion, I have become convinced by the testimony in this case that there is much to be said for the polygraphic art. It undoubtedly has many valid uses, and its principal objective is to provide a means for ascertaining the truth, which is in harmony with the goals of the judicial process. The physiological and technical assumptions upon which it relies appear to be valid, and it may well be that further developments and refinements in the utilization of the polygraph may some day merit its being accorded a place in a court proceeding.

"However, although the inquiry was far from complete, the experience of this case has amply shown that, as of now, the validity of a polygraphic test is dependent upon a large number of variable factors, many of which would be very difficult, and perhaps impossible, to assess. In a given case, the time required in order to explore and seek to adjudge such factors would be virtually incalculable (we did little more than make a beginning in the present case). Accordingly, this court is impelled to the conclusion that the administration of justice simply cannot tolerate the burden of litigation inherently involved in such a process." *United States v. Urquidez,* 356 F. Supp. 1363, 1367 (C.D. Cal. 1973).

*See also United States v. Wilson,* 361 F. Supp. 510 (D. Md. 1973). As we have previously said, we can see merit in the position that the burden imposed on the trial court to determine whether to admit stipulated polygraph evidence may outweigh the probative value of the evidence.

Thus it is apparent that if the second *Stanislawski* condition is to function as a control on the reliability of stipulated polygraph evidence it might be desirable for this court to require a trial court to hold a hearing under

*Stanislawski.* In addition, standards, guidelines or criteria would have to be developed for use by the trial courts in determining admissibility of the evidence and for use of the appellate courts in reviewing the trial court's exercise of its discretion.

The third *Stanislawski* condition limits impeachment of the examiner's evidence to cross-examination. Although cross-examination is an effective tool of impeachment, it may not in all situations provide a sufficient basis for the jury to assess the competence of the witness and the merits of the test.[20] In *United States v. Wilson,* 361 F. Supp. 510 (D. Md. 1973), the district court concluded that cross-examination alone is not a sufficient means of insuring reliability, saying:

[20] *See, e.g.,* Mendoza's offer of proof from *State v. Mendoza, supra,* 80 Wis.2d at 159–160.

"Defendant offered to prove that Robert A. Brisentine, a 'senior polygraph examiner' for the Army Criminal Investigation Command, would testify that though examiner Anderson testified he had conducted 600 or 700 polygraph examinations in the Army, he had in fact conducted 125 examinations, three of which were inaccurately scored.

"Defendant also offered to prove that some of the test questions were improper, that the scoring system used by Anderson was not an established polygraph method, and that the results, properly interpreted by other experts, did not indicate deception.

"After the close of all testimony but before a conference on instructions defendant offered to prove that the previous night a one and one-half hour telephone conversation between Brisentine and Anderson took place in which Anderson acknowledged he had scored the test data improperly and that the only conclusion that could be drawn from the charts was that with respect to four crime issue questions, the results were inconclusive and no opinion of deception could be given. The fifth crime issue question was found to be 'border line deception.'

"The district attorney asserted this offer 'somewhat overstated the matter' but nevertheless recommended that 'justice would best be served' by instructing the jury they should not consider the polygraph evidence. The motion was denied." *Mendoza,* 80 Wis.2d at 159–160.

·"The proponents of admissibility suggest that a jury can properly assess the competence and merit of the testimony of an examiner subjected to cross-examination. This contention is of dubious validity, as a rule. The cross-examination of an expert poses a formidable task; it is the rare attorney who knows as much as the expert. Given the numerous subtleties of interpretation inherent in modern polygraphy and the mysteriousness of the technique to the citizen, the danger of confusion of the jury is great. The jury may be misled, and may give undue weight to the testimony.

"The danger level rises geometrically because of the disproportionate influence the polygraph examination evidence inevitably will exercise, both because germane to credibility on the ultimate finding and because of the consumption of time necessarily involved in examination, cross examination and battle of experts. The specter of 'trial by polygraph' replacing trial by jury is more than a felicitous slogan. The prospect of the admission of polygraph examinations taken by a non-party witness accentuates this troublesome proposition." *United States v. Wilson,* 361 F. Supp. 510, 513 (D. Md. 1973).

The alternative of allowing polygraph experts to testify to impeach the testimony of the expert who administered the test has its own difficulties which were discussed in *Mendoza* in both the majority and dissenting opinions. Absent some assurance (which is presently lacking) of the utility of allowing expert witnesses to testify in these cases, there is little to support the consumption of judicial resources which such an inquiry would entail. An even more substantial danger is that the defendant's trial might, as a result of permitting this testimony, become a trial of the polygraph and the polygraph operator rather than a trial of the defendant's guilt.

Thus we view the third condition as essentially a rough compromise between permitting the defendant to attack the polygraph testimony and avoiding the feared result that the focus of the trial will shift to the polygraph. Although in *Mendoza* we did not permit such expert

testimony, if the *Stanislawski* rule is to be continued this question should be re-examined. In some cases the compromise, no doubt, is an accurate measure of the weight of the competing interests. In others we fear it may not be. We recognize that our capability of weighing these interests is limited by the lack of an understanding of the weight the jury gives polygraph evidence. This concern leads us to the last *Stanislawski* condition.

The fourth and final condition set forth in *Stanislawski* is that the jury be instructed as to the limited function of the testimony. Several courts and commentators have discussed the policy "costs" or dangers associated with the admission of the polygraph: confusion of and prejudice to the jury; intrusion into the jury's historical role of determining the credibility of witnesses; inordinate use of court time and resources.

We have no empirical data as to the effect of the instruction or the influence of polygraph evidence on the conduct of the trial or on the jury verdict. Courts obviously fear that the trier of fact will be unduly persuaded by the polygraph thinking it infallible scientific evidence. Courts are concerned that the polygraph has an aura of objectivity and irrebuttability to the layman, that the lie detector has the reputation of being a perceptive discerner of the truth, and that the instruction may not overcome the jury's inclination to accept the seemingly objective and scientific evidence.

The parties' inability to attack the competence of the examiner or the conditions of the examination except by cross examination impedes the jury's ability to understand the strengths and weaknesses of the instrument and to evaluate the testimony. Yet limiting impeachment to cross-examination appears to be important in order to prevent the polygraph from becoming the focus of a trial in which this evidence is admitted.

The eighth circuit court of appeals summarized these considerations relating to the integrity of the trial as follows:

"When polygraph evidence is offered in evidence at trial, it is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi. During the course of laying the evidentiary foundation at trial, the polygraphist will present his own assessment of the test's reliability which will generally be well in excess of 90 percent. He will also present physical evidence, in the form of the polygram, to enable him to advert the jury's attention to various recorded physiological responses which tend to support his conclusion. Based upon the presentment of this particular form of scientific evidence, present-day jurors, despite their sophistication and increased educational levels and intellectual capacities, are still likely to give significant, if not conclusive, weight to a polygraphist's opinion as to whether the defendant is being truthful or deceitful in his response to a question bearing on a dispositive issue in a criminal case. To the extent that the polygraph results are accepted as unimpeachable or conclusive by jurors, despite cautionary instructions by the trial judge, the jurors' traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is preempted.

" . . .

"It may be argued that all forms of scientific evidence may have a substantial effect upon jurors and may tend to invade the factfinding province of the jury; thus, polygraph evidence is not objectionable on this basis. However, polygraph evidence is distinguishable from other types of scientific evidence in that its scope is much broader. Scientific evidence based on ballistic analysis, fingerprint comparison, handwriting analysis, voiceprint or spectrographic analysis, and neutron activation analysis is elicited solely for the purpose of identifying either an individual or an object allegedly involved in the perpetration of a criminal act. These scientific tests do not purport to indicate with any degree of conclusiveness that the defendant who is so identified or connected with the object actually committed the crime. The jury, after receiving such expert testimony, has the additional re-

sponsibility of reviewing other facts which tend to prove or disprove defendant's connection with the crime and, if participation is shown, the jury may further be required to ascertain the defendant's mental state at the time of the crime in appropriate cases.

"The role of the jury after a polygraphist has testified that the results of a polygraph examination show that the defendant's denial of participation in the crime was fabricated is much more circumscribed. If the expert testimony is believed by the jury, a guilty verdict is usually mandated. The polygraphist's testimony often is not limited to mere identification or any other limited aspect of defendant's possible participation in the criminal act. Through the testimony of the polygraph expert relating to whether the defendant was being truthful in his responses concerning participation in the crime, the expert is thus proffering his opinion based on scientific evidence bearing upon the sole issue reserved for the jury—is the defendant innocent or guilty? Is this good or bad? . . ." *United States v. Alexander*, 526 F.2d 161, 168, 169 (8th Cir. 1975).

*See also United States v. Flores*, 540 F.2d 432 (9th Cir. 1976).

The uncertain impact of polygraph evidence on a jury is a question of substantial concern. We acknowledge the importance of this question. We are, however, not able to express a judgment on the adequacy of the fourth *Stanislawski* condition as a means of ensuring that the jury places the polygraph evidence in its proper perspective as defined in *Stanislawski*.

## V.

To conclude, we have not undertaken to evaluate the reliability of the polygraph. We recognize today, as we did in *Stanislawski*, that the science and art of polygraphy have advanced and that the polygraph has a degree of validity and reliability. We are, nevertheless, not persuaded that the reliability of the polygraph is such

as to permit unconditional admission of the evidence. Our analysis of and our experience with the *Stanislawski* rule lead us instead to conclude that the *Stanislawski* conditions are not operating satisfactorily to enhance the reliability of the polygraph evidence and to protect the integrity of the trial process as they were intended to do.

The *Stanislawski* rule which appeared in 1974 to be a reasonable compromise between unconditional admission of and unconditional rejection of polygraph evidence does not appear at this time to be the satisfactory compromise, and we decline to continue to permit the admission of polygraph evidence pursuant to the rule set forth in *Stanislawski*.

We also reject the alternative of awaiting continued refinement of the *Stanislawski* rule on a case-by-case method.[21] Adequate standards have not developed in the seven years since *Stanislawski* to guide the trial courts in exercising their discretion in the admission of polygraph evidence. The lack of such standards heightens our concern that the burden on the trial court to assess the reliability of stipulated polygraph evidence may outweigh any probative value the evidence may have.

For the reasons we have set forth, we hold that hereafter it is error for a trial court to admit polygraph evidence in a criminal proceeding unless a *Stanislawski* stipulation was executed on or before September 1, 1981. We do, however, view the rule announced in this case declaring polygraph evidence inadmissible as applicable to Dean, even though the stipulation was executed prior to

[21] Conditions other than the *Stanislawski* conditions can be imposed. For example, polygraph evidence may be admissible only as to the defendant after defendant testifies, and not as to a witness, *see Commonwealth v. Vitello*, 376 Mass. 426, 381 N.E.2d 582 (1978); *Commonwealth v. Moynihan*, 376 Mass. 468, 381 N.E.2d 575 (1978); *Commonwealth v. Allen*, 377 Mass. 674, 387 N.E.2d 553 (1979); *Commonwealth v. Moore*, 393 N.E.2d 904, 909 (Mass. 1979).

September 1, 1981. Consequently we affirm the decision of the court of appeals reversing his conviction.

*By the Court.*—Decision of the court of appeals affirmed.

DAY, J. (*concurring*). I concur in affirming the court of appeals in this case. I also agree that this Court should hold it to be error to admit polygraph examination results for any purpose unless a *Stanislawski* stipulation was executed on or before September 1, 1981. The majority opinion is a thorough survey of the present status of the polygraph both in courts and among technicians working with the various devices. I disagree, however, with the opinion's conclusion that:

". . . the court is not now prepared to say . . . that polygraph evidence is so unreliable that it cannot be admitted under any circumstances." (*Supra,* p. 265, see also, pp. 233, 245, 254 and 278).

In *McLemore v. State,* 87 Wis.2d 739, 751, 275 N.W.2d 692, (1979), a minority of this court, (Connor T. Hansen, J., Callow, J., and I) said:

"The minority concludes that polygraphy in its present state may be useful as an investigative tool, but that its limitations and potential for misleading factfinders are such that it should not be part of evidentiary system."

The problems of polygraphy pointed out in the majority opinion in the case at bar re-enforces the position of the minority in *McLemore, supra.* I affirm my position in *McLemore.*

I am authorized to state that Justice Callow and Justice Steinmetz join in this concurrence.